309 Ga. 38
FINAL COPY

S20A0127.  RICKMAN v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Victoria Rickman was convicted of malice murder and a related firearm offense in connection with the shooting death of William Carter, Jr.[1]  Rickman appeals, arguing that she was denied effective assistance of counsel and that the trial court erred in admitting improper character evidence pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)").  We affirm.

---

[1] On December 3, 2013, Rickman was indicted by a DeKalb County grand jury for malice murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a crime.  At a jury trial from August 17 to September 1, 2017, Rickman was found guilty of all charges.  She was sentenced to life without parole plus five years for malice murder and possession of a firearm during the commission of a crime.  The remaining counts were either vacated by operation of law or merged for sentencing purposes.

Rickman filed a motion for new trial on October 12, 2017, which she subsequently amended through new counsel on March 22 and March 27, 2019. After a hearing, the trial court denied the motion on June 14, 2019.  Rickman timely filed a notice of appeal; the appeal was docketed to the term of this Court beginning in December 2019 and was thereafter submitted for a decision on the briefs.

Viewed in the light most favorable to the jury's verdict, the evidence presented at trial established that Rickman and Carter had a tumultuous on-again, off-again relationship with a history of verbal and physical abuse, false accusations of sexual assault, empty threats to obtain temporary protective orders, and numerous calls to 911. In the days leading up to Carter's death, the pair was talking and meeting again despite a recent break-up. Three days before Carter's death, however, he called 911 and requested that officers remove Rickman from his residence. When the police arrived, Rickman alleged that Carter had hit her; however, Rickman had no visible injuries. Officers also learned that Rickman had sent text messages to Carter's cell phone that included false accusations that Carter had kidnapped and threatened her. Thereafter, Rickman was removed from the residence, and Carter told her to never contact him again.

Then, in the early morning hours of September 13, 2013, officers responded to a third party's residence on Clifton Road in DeKalb County regarding a claim of rape and shots fired. When

officers arrived, Rickman was standing in the doorway holding a small dog; her hair was wet and she had on a clean pair of pajamas. She did not appear to be injured, and nothing in the home looked disturbed or out of place.   Rickman told the officers, "he raped me again and I shot him."

Officers found Carter lying face up on the bed with multiple gunshot wounds to his body; he was naked, his watch was on the nightstand, and his gold chain necklace was in his left hand.  His clothes were bunched up on the floor next to the bed, and a pair of Rickman's underwear was nearby wrapped around a used tampon. An autopsy revealed that Carter was shot ten times — four times in the chest, three times in the back, once in the arm, and twice in the head.  Three of the gunshot wounds had evidence of stippling while the remaining seven did not.  Carter also had bruises to his chin and left arm, which were likely caused by a blunt object.  The medical examiner concluded that Carter died as a result of his gunshot wounds.

Rickman was taken to Grady Hospital for a physical

examination and a rape kit. Rickman told the treating physician that Carter forced her to have vaginal sex, after which he restrained and beat her. Rickman stated that, in order to defend herself, she grabbed a gun from the nightstand and shot Carter. Though the vaginal swabbings taken during Rickman's exam matched a partial profile of Carter's DNA, Rickman's examining physician testified that he found no injuries on Rickman consistent with her description of events, and no signs of trauma to her vaginal cavity.

Back at the scene, officers located nine shell casings and one bullet in the bedroom; the murder weapon, a .40-caliber semi-automatic firearm, was located inside the drawer of the nightstand on the side of the bed farthest from Carter's body. Officers found blood spatter on the wall, curtains, window, and a pillow on the floor. Expectorant blood spatter[2] was found on the wall closest to Carter's feet, and passive blood drops[3] were located on Carter's feet and on

---

[2] Testimony at trial established that this type of blood spatter is caused by the gunshot wound victim coughing up blood.

[3] Testimony at trial established that this type of blood spatter is not caused by direct or indirect force, but by blood dripping from the body onto another surface.

the floor below. Based upon the type, pattern, and location of the blood spatter on the wall, and the blood flow patterns on Carter's face and chest, the State's crime scene expert opined that Carter was standing and facing the bedroom wall when he was shot in the back, after which he fell to the bed and the remaining shots were fired.

Officers also recovered a total of five cell phones during their investigation — two belonging to Rickman, two belonging to Carter, and one belonging to an acquaintance of Rickman.[4] A forensic analysis of these phones and relevant cell phone records showed that, on the evening before the shooting, Rickman exchanged text messages with the man she was living with, asking him not to come home because she "[didn't] want to see a man." Approximately 30 minutes later, Rickman began communicating with Carter via text messages and phone calls. During this almost five-hour exchange, Carter called Rickman the love of his life and indicated that he wanted to reconcile; however, he also noted that Rickman treated

---

[4] Officers also obtained voluminous cell phone records for the numbers associated with all five cell phones.

him poorly because she constantly called the police and made allegations against him that were not true. Cell tower data showed that, around 12:20 a.m. on September 13, Carter's phone pinged a tower near Rickman's house while the two were still talking on the phone. Thereafter, Rickman's phone had no activity until 2:14 a.m., when she called another male acquaintance, and then 2:16 a.m., when she called 911 to report the shooting.

The State also presented evidence of prior difficulties between Rickman and Carter. Specifically, the State introduced evidence that in March and April 2012, Rickman sent herself threatening text messages but made it appear as if Carter had sent them to her. The State also introduced evidence of incidents from January 2012[5] and May 2013[6] wherein Rickman assaulted Carter and then called the

[5] In January 2012, Rickman called the police and alleged that Carter had held her down and sexually assaulted her. She told officers that she hit Carter in the back of the head with a hammer in order to defend herself. Carter denied the allegations and said that Rickman had "gone crazy." Carter had a wound to the back of his head and a bite mark on his shoulder. Rickman had red marks on her wrists. Carter was arrested, but the charges were eventually dropped when Rickman told prosecutors that she had made up the sexual assault allegations.

[6] During this incident, Rickman showed up at Carter's home in Cobb

police and falsely accused Carter of assaulting her.  Finally, the State introduced evidence of a prior incident involving William Plunkett, Rickman's ex-boyfriend, pursuant to OCGA § 24-4-404 (b), wherein Rickman threatened to falsely accuse Plunkett of rape.

1.  Though not enumerated as error, consistent with our customary practice in murder cases, we have reviewed the sufficiency of the evidence, and we conclude that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Rickman was guilty of the crimes for which she was convicted.  See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).  Indeed, though Rickman presented evidence that she had acted in self-defense, the jury was free to reject this claim.  See *Shaw v. State*, 292 Ga. 871, 872 (1) (742 SE2d 707) (2013) ("[I]ssues of witness credibility and justification

County, entered his house without permission, grabbed him by the gold necklace on his neck, and forcefully led him around his house demanding to know to whom he had been talking.  Eventually, Carter was able to remove Rickman from his home; she then proceeded to run through the neighborhood yelling "rape."  When officers arrived, Rickman alleged that Carter had raped and beat her, which he and other witnesses denied.  The entire interaction was recorded on Rickman's cell phone, which contradicted her version of events.

are for the jury to decide, and the jury is free to reject a defendant's claim that [s]he acted in self-defense." (citation and punctuation omitted.)).

2.    Rickman alleges that she received ineffective assistance of counsel at trial.  See *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).  Specifically, Rickman alleges that trial counsel was ineffective for failing to file a motion to suppress the evidence obtained from Rickman's two cell phones because, she claims, the search warrants were not sufficiently particularized. "[W]hen trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." (Citations and punctuation omitted.)  *Hayes v. State*, 298 Ga. 98, 106 (2) (d) (779 SE2d 609) (2015).  Rickman has failed to meet her burden.

The record shows that law enforcement searched two iPhones belonging to Rickman during their investigation — an iPhone 4 and an iPhone 5.  Rickman's iPhone 4 was in the possession of the Cobb

County Police Department as part of their investigation into the May 2013 incident wherein Rickman had falsely claimed Carter had raped her. In October 2013, officers from the Atlanta Police Department obtained warrants to retrieve Rickman's iPhone 4 from Cobb County and to search the phone's contents; however, officers were unable to access the information on the cell phone at that time. Investigators sought and obtained a second search warrant for the iPhone 4 in June 2017 because new software became available that allowed officers to access the information on Rickman's cell phone. This search warrant permitted officers to "search all incoming and outgoing calls and text messages, all videos and photos on the cell phone and any other communication found between Ms. Rickman and Mr. Carter," related to the crime of murder.

Rickman's iPhone 5 was seized during a post-incident search of Rickman's home. Thereafter, investigators obtained search warrants in September 2013 and May 2017 to search the contents of the iPhone 5 for evidence related to Carter's murder. However, investigators were unable to access the phone's contents because it

was password-protected. Eventually, officers obtained the four-digit passcode to the iPhone 5 and obtained a third search warrant in June 2017 that allowed officers to search the phone for, among other things, messages, photographs, videos, contacts, and any other application data, "or any other evidence of the crime of murder."

At the hearing on Rickman's motion for new trial, trial counsel testified that she reviewed the search warrants in question, as well as their supporting affidavits, and saw no basis to file a motion to suppress. Though trial counsel could not recall "one way or another doing an analysis as to whether [the search warrants] were sufficiently particularized," she did review the search warrants for probable cause and determined that a motion to suppress would not be successful.

Even if counsel had filed a motion to suppress for lack of particularity, Rickman has failed to show that such a motion would have been successful. As this Court recently explained, "the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and . . .

a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." (Citation and punctuation omitted.) *Leili v. State*, 307 Ga. 339, 344 (2) (a) (834 SE2d 847) (2019).

Here, the warrants, read as a whole, limited the search of the contents of Rickman's cell phones to items reasonably appearing to be connected to Carter's murder. See *Reaves v. State*, 284 Ga. 181, 184 (2) (d) (664 SE2d 211) (2008) (warrants containing residual clauses limiting the items to be seized to those relevant to the crimes identified are sufficiently particular and do not authorize a general search in violation of the Fourth Amendment). See also *Leili*, 307 Ga. at 344 (2) (a). Accordingly, Rickman has failed to show that trial counsel was deficient.

3. Prior to trial, the State filed a notice of intent to introduce evidence of an incident that occurred between Rickman and her ex-boyfriend William Plunkett. Specifically, the record shows that Rickman and Plunkett had an intimate relationship and the two moved in together in August 2012. After a few weeks, however, the

couple had an argument, and Plunkett requested that Rickman move out of the house. Rickman refused and told Plunkett that, if he called the police, she would tell them that he had tried to beat and rape her. After a hearing, the trial court admitted this Rule 404 (b) evidence for the purposes of showing Rickman's motive and intent in the crimes charged. Rickman contends that this was error.

Assuming without deciding that the admission of this evidence was erroneous, any error was harmless. The evidence of Rickman's guilt was strong. The forensic evidence showed that Carter was shot in the back while facing the bedroom wall; cell phone and police records demonstrated Rickman's numerous prior false reports of sexual assault against Carter; and although Rickman claimed that the reason she shot Carter was that he had raped her, the doctor who performed Rickman's rape kit and physical exam found no signs of trauma to her vaginal cavity and no injuries consistent with her description of events. See *Hood v. State*, 299 Ga. 95, 105-106 (4) (786 SE2d 648) (2016) (admission of Rule 404 (b) evidence harmless where evidence of guilt was strong). In light of this evidence and, in

particular, the evidence that Rickman had made false accusations of sexual assault against the victim, Plunkett's testimony that Rickman had threatened to falsely accuse him of rape likely had little, if any, effect on the jury's appraisal of Rickman's self-defense claim. Accordingly, "it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.) *Peoples v. State*, 295 Ga. 44, 55 (4) (c) (757 SE2d 646) (2014).

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 20, 2020 --- RECONSIDERATION DENIED JUNE 16, 2020.
Murder. DeKalb Superior Court. Before Judge Boulee.
*Daniel H. Petrey*, for appellant.
*Peter J. Skandalakis, District Attorney, Sheila A. Ross, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.