315 Ga. 613
FINAL COPY

S22A0967.  THE STATE v. WILSON.

COLVIN, Justice.

The State appeals from the grant of defendant Roceam Wilson's motion to suppress.[1]  The State contends that the trial court erred in concluding that the search warrant issued for Wilson's cell phones was overbroad and authorized a general search in violation of the Fourth Amendment to the United States Constitution.  In reviewing the trial court's grant of the motion to suppress, "we apply the well-established principles that the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review."  *State v. Palmer*, 285 Ga. 75, 78 (673 SE2d 237) (2009) (citation and punctuation omitted).  Applying that standard here,

---

[1] Wilson was indicted for, among other things, murder in connection with the shooting death of Bradly Jordan.  The State appeals the trial court's pretrial ruling pursuant to OCGA § 5-7-1 (a) (5), and we have jurisdiction to consider this appeal.  See Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8).

we see no error in the trial court's order.  Accordingly, we affirm.

The record shows that, on January 28, 2021, Bradly Jordan was shot and killed while performing pest control services at an apartment complex.  After conducting an investigation at the crime scene, officers determined that the shooter was a "black male" driving a teal green "[1990]s model Ford Aerostar van" with a missing hubcap.  Utilizing a license plate tracking system, officers located a van matching this description a few miles from the incident location.  Wilson was listed as the registered owner of the vehicle.  Officers conducted a traffic stop on the Ford Aerostar and spoke with Wilson, who was in the driver's seat.  After answering some questions, Wilson was arrested and officers impounded his vehicle, which was later searched pursuant to a warrant.  During that search, officers located, among other things, two cell phones, both of which belonged to Wilson.

One of the lead investigators subsequently sought a second search warrant "for a forensic examination" of the cell phones.  The investigator completed a sworn affidavit and submitted it to the

magistrate in support of the search warrant application. Other than the information contained in the search warrant affidavit, no other material or testimony was provided to the magistrate.

The magistrate subsequently issued a warrant that authorized a forensic search of Wilson's cell phones "to be completed in order to obtain any and all stored electronic information, including but not limited to; user account information, stored phone information, images, text messages, videos, documents, e-mails, internet activity, call logs, contact information, phonebook information, or any deleted data." The warrant further included preprinted form language stating that "[t]he foregoing described property, items, articles, instruments, and person(s) to be searched for and seized constitute evidence connected with the foregoing listed crime(s)[2] and is/are: (check ALL that are applicable) (OCGA § 17-5-21)[3]." The swearing

---

[2] The search warrant asserted that Wilson was believed to have committed felony murder, aggravated assault, and possession of a firearm during the commission of a felony.

[3] This Code section does not reference criminal activity. Instead, it lists the process by which law enforcement officers must abide when seeking a warrant.

officer then checked four boxes on the preprinted form, indicating that investigators believed the cell phones were: "intended for use in the commission of the crime(s) herein described"; "used in the commission of the crime(s) herein described"; "tangible, corporeal or visible evidence of the commission of the crime(s) set forth above"; and "intangible, incorporeal or invisible evidence of the commission of the crime(s) set forth above."

Wilson challenged the validity of the cell phone search warrant in a pretrial motion to suppress. After a hearing, the trial court granted Wilson's motion, finding that the search warrant was "overly broad and authorized a general search of [Wilson's] personal effects without probable cause in violation of the Fourth Amendment and OCGA § 17-5-21." The State alleges that this was error, contending that the warrant included sufficient probable cause and sufficient particularity to avoid authorizing a general search. Pretermitting the issue of probable cause, we agree with the trial court that the warrant did not meet the particularity requirement and therefore authorized an impermissible general

4

search.

The Fourth Amendment to the United States Constitution "require[s] that a search warrant particularly describe the article or articles sought." *Dobbins v. State*, 262 Ga. 161, 164 (3) (415 SE2d 168) (1992). In addition to requiring that officers have enough guidance to locate and seize only those items the warrant authorizes them to seize, see *Fair v. State*, 284 Ga. 165, 170 (3) (a) (664 SE2d 227) (2008), this particularity requirement also prevents general searches — that "general, exploratory rummaging in a person's belongings" by the government that has been rejected since the founding as a violation of "fundamental rights." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (II) (C) (91 SCt 2022, 29 LE2d 564) (1971), holding modified by *Horton v. California*, 496 U.S. 128 (110 SCt 2301, 110 LE2d 112) (1990); *Marron v. United States*, 275 U.S. 192, 195 (1) (48 SCt 74, 72 LE 231) (1927) ("General searches have long been deemed to violate fundamental rights. It is plain that the [Fourth] Amendment forbids them."). See also *Groh v. Ramirez*, 540 U.S. 551, 559 (II) (124 SCt 1284, 157 LE2d 1068) (2004); Wayne R.

LaFave, 2 Search & Seizure § 4.6 (a) (6th ed. 2022). The particularity requirement is "applied with a practical margin of flexibility, depending on the type of property to be seized, and a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *Rickman v. State*, 309 Ga. 38, 42 (2) (842 SE2d 289) (2020) (citation and punctuation omitted). "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Groh*, 540 U.S. at 559 (II) (quoting *Stanford v. Texas*, 379 U.S. 476 (85 SCt 506, 13 LE2d 431) (1965) (punctuation omitted)).

While the State concedes that the warrant "broadly target[s] the data" in Wilson's cell phones, the State argues that, when read as a whole, the warrant sufficiently limits the search of the phones to evidence connected with the crimes. We disagree. As the State acknowledges, the search warrant broadly authorizes the seizure of "any and all stored electronic information" on the phones, "including

6

but not limited to" various kinds of electronic information. The State points to the preprinted form language following this sweeping authorization as "limiting" in nature. However, that language clearly states that "[t]he foregoing described property" — that is, "any and all stored electronic information" on the phones — "constitutes evidence connected with the crimes." This language cannot plausibly be read, as the State suggests, to limit the otherwise limitless authorization to search for and seize any and all data that can be found on Wilson's cell phones. Indeed, the warrant's complete absence of limiting language distinguishes it from other warrants we have upheld in prior cases based on the presence of so-called "residual clauses" or other limiting language. Compare *Palmer v. State*, 310 Ga. 668, 675 (2) (c) (853 SE2d 650) (2021) (search warrant authorizing search and seizure of, among other things, "cell phones (to include all data contained therein) . . . *which are being possessed in Violation of Georgia Law(s): O.C.G.A. [§] 16-5-1 Murder*" was sufficiently particularized when, reading the warrant as a whole and "in a common-sense fashion," it sufficiently

7

"listed classes of items that, as a practical matter, were likely to be found relevant" to the crimes in the warrant, and it further limited those "classes of items to those relevant to the crime" (citation and punctuation omitted; emphasis supplied)); *Westbrook v. State*, 308 Ga. 92, 97-98 (3) (a) n.5 (839 SE2d 620) (2020) (search warrant for "electronic data" on defendant's cell phone was sufficiently particularized "to enable a prudent officer to know to look for photographs and videos" because the language of the warrant "limited the scope of the search to evidence *pertaining to the commission of the murder*" (emphasis supplied)); and *Rickman*, 309 Ga. at 42 (2) (warrants that included language authorizing officers to search cell phones for "messages, photographs, videos, contacts, and any other application data, *or any other evidence of the crime of murder*" were sufficiently particularized because the language of the warrants limited the search of the cell phones "to items reasonably appearing to be connected to [the victim's] murder." (emphasis supplied)). Because the warrant in this case was not sufficiently particularized, the trial court did not err in concluding that the

8

warrant authorized an impermissible general search of Wilson's cell phones.

The State also contends that the evidence obtained from Wilson's cell phones is admissible under the *Davis*[4] good-faith exception to the exclusionary rule. This good-faith exception applies to "searches conducted [by police officers] in objectively reasonable reliance on binding appellate precedent that is later overruled." *Outlaw v. State*, 311 Ga. 396, 400 (2) (b) (858 SE2d 63) (2021) (citation and punctuation omitted). The State asserts that the search here was lawful under current Georgia precedent, and that if we conclude otherwise, we would be "revising" our precedent. However, the State incorrectly assumes that this Court must overrule Georgia precedent in order to affirm the trial court's order. As shown above, well-established legal precedent supports our conclusion that the trial court properly suppressed the cell phone evidence in this case. As a result, *Davis* does not apply and the

---

[4] *Davis v. United States*, 564 U.S. 229, 241 (III) (131 SCt 2419, 180 LE2d 285) (2011).

State's argument fails. Accordingly, we affirm the trial court's order granting Wilson's motion to suppress.

*Judgment affirmed. All the Justices concur, except LaGrua, J., who concurs in judgment only.*

PETERSON, Presiding Justice, concurring.

I fully agree that the trial court correctly suppressed evidence derived from the general warrants issued in this case. I write separately to highlight that our cases involving so-called "residual clauses" (i.e., boilerplate language purporting to limit officers to searching and seizing "other related items to the crime [at issue]," *Reaves v. State*, 284 Ga. 181, 185 (2) (d) (664 SE2d 211) (2009)) may be unduly complicating the issue.

"The problem posed by the general warrant is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings. The Fourth Amendment addresses the problem by requiring a 'particular description' of the things to be seized." *Andresen v. Maryland*, 427 U.S. 463, 480 (96 SCt 2737, 49 LE2d 627)

10

(1976) (cleaned up) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (91 SCt 2022, 29 LE2d 564) (1971)). In practice, that requirement means that the warrant allows the officer to identify the object of the search or seizure "definitely and with reasonable certainty." *Hourin v. State*, 301 Ga. 835, 844 (3) (b) (804 SE2d 388) (2017) (citation and punctuation omitted). Naturally, the degree of specificity required "will vary with the circumstances involved." Id. (citation and punctuation omitted).

But a general, catch-all phrase (a "residual clause") in the description of places to be searched or things to be seized does not necessarily invalidate an otherwise proper warrant. In *Andresen*, the United States Supreme Court rejected an argument that warrants that were otherwise "models of particularity . . . were rendered fatally 'general' by the addition . . . of the phrase 'together with other fruits, instrumentalities, and evidence of crime at this (time) unknown.'" 427 U.S. at 479. The petitioner argued that this clause, read in isolation, permitted the search for and seizure of any evidence of any crime. See id. But the Court read the phrase in

11

context, explaining that "the challenged phrase" — that is, the residual clause — "must be read as authorizing only the search for and seizure of evidence relating to the crime of false pretenses [alleged in that case]." *Id.* at 480 (citation and punctuation omitted). "The warrants, accordingly, did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence relevant to the crime [charged.]" *Id.* at 481-82. Thus, *Andresen* teaches that residual clauses do not necessarily render an otherwise particularized warrant an unconstitutional general warrant.

For a time, we correctly applied that holding. See *Lance v. State*, 275 Ga. 11, 21 (19) (b) (560 SE2d 663) (2002) (the warrant was sufficiently particularized despite using the phrase "'any other fruits of the crime of murder'" where those words were preceded by a list of specified items, because "[t]he quoted phrase [was best] understood as limiting the search to items . . . reasonably appearing to be connected to the specific crime delineated in the warrant" and "the nature of the probable evidence"), disapproved on other grounds

by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018); *Reaves*, 284 Ga. at 184-88 (2) (d) (four search warrants specifying certain items followed by different residual clauses covering "any other item of evidence," "any other item of evidentiary value," and "any other trace evidence" that would show that the named crime had been committed were not impermissible general warrants, and so "provided [adequate] guidelines for the officers conducting the search") (citation and punctuation omitted); see also *Lawler v. State*, 276 Ga. 229, 233 (4) (c) (576 SE2d 841) (2003) (objects of a search warrant for "'guns, ammunition, clothing, shoes, and other related items to the crime of murder,'" were "described with sufficient particularity").

But in the last few years, our cases have begun to suggest that an otherwise general warrant might be *made* particularized by a residual clause. In *Rickman v. State*, 309 Ga. 38, 42 (2) (842 SE2d 289) (2020), for example, we cited *Reaves* (our seminal residual clause case) for the proposition that "warrants containing residual clauses limiting the items to be seized to those relevant to the crimes

13

identified are sufficiently particular and do not authorize a general search in violation of the Fourth Amendment." But when we applied that principle to the facts in that case, we held that "the warrants [there], read as a whole," sufficiently "limited the search of the contents of Rickman's cell phones to items reasonably appearing to be connected to [the victim's] murder." Id. In other words, we seemed to suggest that the residual clause of the warrant (covering "any other evidence of the crime of murder" after a list of specific items like messages, photographs, and videos) was a reason to find the *rest* of the description sufficiently particular. See also *Palmer v. State*, 310 Ga. 668, 675 (2) (c) (853 SE2d 650) (2021) ("'Read in a common-sense fashion and in the context of the preceding list of items and the residual clause,' warrants limiting items to be seized to those relevant to enumerated crimes 'have sufficient specificity, satisfying the particularity requirement of the Fourth Amendment.'" (quoting *Reaves*, 284 Ga. at 188 (2) (d))); *Westbrook v. State*, 308 Ga. 92, 97-98 (3) (a) & n.5 (839 SE2d 620) (2020) (search warrant describing "Phone identification data, Phone number assigned to the unit,

14

Address book, Incoming and outgoing call logs, Incoming and outgoing SMS text logs," and "Electronic data" on cell phone was sufficiently particularized in context "to enable a prudent officer to know to look for photographs and videos stored on Westbrook's cell phone," especially because the warrant "limited the scope of the search to evidence pertaining to the commission of the murder" — so ineffectiveness claim failed since the objection would have been meritless); *Leili v. State*, 307 Ga. 339, 343-44 (2) (a) (834 SE2d 847) (2019) (a warrant that authorized search and seizure of "all electronic devices which are capable of analyzing, creating, displaying, converting, transmitting or storing electronic or computer impulses or data" was sufficiently particularized because "when read as a whole, 'the warrant here must be understood as limiting the search to items (in addition to the items specifically mentioned in the warrant) reasonably appearing to be connected to the specific crimes delineated in the warrant.'" (citations and punctuation omitted)).

I joined each of these decisions. But upon further consideration,

I am concerned that we may have mistaken the import of the relevant principles.

First, the Supreme Court in *Andresen* held only that an otherwise particularized warrant was not made unconstitutionally general by the presence of residual language — instead, *the residual clause* had to be read in the light of the language before it. 427 U.S. at 480-482. But the inverse does not follow; the logic of *Andresen* does not support the idea that an otherwise general warrant, lacking particularity in the places to be searched or things to be seized, can be saved by this sort of boilerplate language.[5] Taking the warrants in this case as an example, a warrant that fails to give any parameters "for a forensic examination" of cell phones is not narrowed by the empty assurance that the search will only be

---

[5] This misstep may have stemmed from a slight ambiguity in the wording of *Reaves*. We held that "[t]he residual clauses in the search warrants at issue in this case limit the items which may be seized to evidence of cruelty to children and . . . murder." 284 Ga. at 185 (2) (d). In context, that meant that the residual clauses *themselves* were limited to evidence of those crimes. See id. But it's easy enough to see how one might mistakenly read this language — specifically the direct object, "items" — to mean the *list* of items *preceding* the residual clauses. And indeed, that seems to be what we've done in recent years.

16

looking for evidence of a particular crime. Perhaps such a warrant may once have been sufficient, when cell phones had a fraction of the functionality and storage capacity that they do now. But today, a caveat that the search is limited to evidence of a particular crime might narrow the *object* of the search, but it gives little or no clarity to an officer as to where to look, for what to look, or how to look for it. See *Hourin*, 301 Ga. at 844 (3).

And second, we appear to have lost sight of the fact that the actual words of the warrant matter; not all clauses do the same work. In fact, several of these cases do not actually involve "residual clauses" at all, at least as *Andresen* and *Reaves* used that term. The warrant in *Palmer* "authorized the search and seizure of '[a]ny fingerprints, any and all firearms, any and all ammunition, shell casings, identification cards, receipts, photos, hand written statements, cell phones (to include all data contained therein), currency, and any and all blood evidence, and DNA, *which are being possessed in Violation of Georgia Law(s): O.C.G.A. [§] 16-5-1 Murder.*'" 310 Ga. at 675 (2) (c) (emphasis supplied); see also *Leili*,

17

307 Ga. at 343 (2) (a) (the warrant used broad language like "all electronic devices which are capable of analyzing, creating, displaying, converting, transmitting or storing electronic or computer impulses or data," but no catch-all residual clause); *Westbrook*, 308 Ga. at 97-98 (3) (a) & n.5 (the warrant described, among other things, "electronic data," and "limited the scope of the search to evidence pertaining to the commission of the murder"). So the language at the end of the *Palmer* warrant *modifies* the rest of the list, it does not add items to it. And yet this group of cases relies on residual clause precedents like *Reaves*, misunderstanding their holdings and muddying the waters on the effect of a true residual clause.

The warrants in *Andresen* and *Reaves*, by contrast, featured catch-all language, *not* a modifying clause. *Andresen*, 427 U.S. at 479 ("together with other fruits, instrumentalities, and evidence of crime at this (time) unknown"); *Reaves*, 284 Ga. at 184 (2) (d) (residual clause covering "'any other item(s) that tend to lead to probable cause that a [particular] crime has been committed'"). So it

18

is a different matter to say that the search warrants in cases like *Palmer* are not "general" because they "list[ ] classes of items that, as a practical matter, were likely to be found relevant to the shooting . . . and the removal of [the victim's body] to the location where it was found." 310 Ga. at 675 (2) (c). In that context, a phrase like "[items] which are being possessed in Violation of Georgia Law(s)" actually does modify (and perhaps in some marginal sense *could* limit) the enumerated items.[6] Id. It seems to me, therefore, that the words of the warrant matter more than our recent cases reflect.

Our "residual clause" cases, in short, have started to suggest a different proposition than the principle upon which they are based, and applied it to a broader spectrum of language than the principle covers. The Court today properly rejects the State's bid to save the warrants here by reference to pre-printed language only distantly resembling a residual clause. But in an appropriate case, we may

---

[6] Although I'm skeptical that this was the case with the actual language used in *Palmer*. What it means to possess an item in violation of the law prohibiting murder is wholly unclear to me; that statute does not prohibit the possession of anything. Once again, it matters what actual language a warrant uses.

need to reconsider some of our related precedent.

I am authorized to state that Chief Justice Boggs, and Justice Warren, Justice Bethel, Justice Colvin, and Justice Pinson join in this concurrence.


PINSON, Justice, concurring.

We need to talk about cell phones.

In *Riley v. California*, 573 U.S. 373 (134 SCt 2473, 189 LE2d 430) (2014), the United States Supreme Court took a small step down the road of applying the Fourth Amendment to the modern cell phone. *Riley* addressed the question whether the police could, without a warrant, search digital information on a cell phone seized from someone who'd been arrested. The answer was no: to search a cell phone incident to arrest, you generally need to "get a warrant." Id. at 403. That holding was important on its own, and it gave needed guidance to both law enforcement and courts. See, e.g., *Hawkins v. State*, 290 Ga. 785 (723 SE2d 924) (2012) (pre-*Riley*,

holding that police could search a cell phone incident to an arrest without a warrant), abrogated by *Riley*, 573 U.S. 373.

But there is more to *Riley*. Along the way to its straightforward holding, *Riley* addressed the nature of modern cell phones and how to view them for purposes of applying the Fourth Amendment. This reasoning was central to *Riley*'s holding, and it demands careful attention in cases like this one and others in which the Fourth Amendment and cell phones intersect.

Before *Riley*, courts (including ours) often applied the Fourth Amendment to cell phones as if they were little different from articles or containers found on or near someone's person. See, e.g., *Hawkins*, 290 Ga. 785; *United States v. Finley*, 477 F3d 250, 260 (5th Cir. 2007), overruled by *Riley*, 573 U.S. 373; *United States v. Deans*, 549 FSupp.2d 1085, 1094 (D. Minn. 2008), overruled by *Riley*, 573 U.S. 373. That was why courts would conclude that police could search them without a warrant if they were seized incident to an arrest: United States Supreme Court precedent had long allowed such warrantless searches of personal property — like clothes,

21

cigarette packs, wallets, and purses — found on or near an arrestee. See *United States v. Robinson*, 414 U.S. 218 (94 SCt 467, 38 LE2d 427) (1973); *Chimel v. California*, 395 U.S. 752 (89 SCt 2034, 23 LE2d 685) (1969).

*Riley* rejected this understanding of cell phones. Indeed, the *Riley* Court supposed treating cell phones like other physical items that could be found on a person was "like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together." *Riley*, 573 U.S. at 393. That is because "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." Id. Today's "phones" are "in fact minicomputers" that serve not only as telephones, but also as "cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers"; they have "immense storage capacity" to support these functions and store other data like "Internet search and browsing history," "[h]istoric location

22

information," and other "app" data; and they collect these "many distinct types of information" "in one place," dating "back to the purchase of the phone, or even earlier." Id. at 393-396.

Based on all of this, the Court reasoned that the "consequences for privacy" of searching a cell phone are substantial. Unlike a search of a wallet or purse or cigarette pack, searching a cell phone can allow police to "reconstruct" "the sum of an individual's private life" going back months or even years, potentially revealing someone's "private interests or concerns," "specific movements down to the minute, not only around town but also within a particular building," and a "montage of the user's life" from whatever apps the person happens to use. *Riley*, 573 U.S. at 394-396. And cell phones are "now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." Id. at 385; see also id. at 395 ("[I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives — from the mundane to the

intimate."); *Carpenter v. United States*, ___ U.S. ___ (138 SCt 2206, 2211, 201 LE2d 507) (2018) ("There are 396 million cell phone service accounts in the United States — for a Nation of 326 million people.").

In light of these unique characteristics of modern cell phones and their "consequences for privacy," the Court held that police generally need to "get a warrant" to search one. *Riley*, 573 U.S. at 394, 403. But it is pretty hard to read all of the reasons *Riley* gave for this holding and come away thinking that the rest of the Fourth Amendment is business as usual when it comes to cell phones. Again, the big premise of *Riley* was that searching a cell phone is not much at all like searching a pocket or a purse. "Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of a *house*: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form — unless the phone is." Id. at 396-397 (emphasis supplied). And as a general matter, the Fourth

Amendment "was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." Id. at 403. The issue is apparent. If a cell phone is a handheld "house" and may hold the sum total of one's private "papers" and "effects," then a search of that device or a seizure of its contents that lacks appropriate restraints seems little different from the general searches that the Fourth Amendment unequivocally forbids.[7]

Take the search warrant in this case. As far as I can tell, that warrant allowed the search and seizure of the data from two cell phones on the theory that (1) they were found in the suspect's van, and (2) criminals commonly use cell phones to talk about crimes. And the scope of the authorized search and seizure looks unlimited:

---

[7] The nature of cell phones also raises questions about how to apply OCGA § 17-5-21, which describes the kinds of things that a warrant can authorize seizure of. For example, that statute treats "private papers" differently than some other types of evidence. See OCGA § 17-5-21 (a) (5), (b). What information on a cell phone, if any, counts as "private papers" subject to this statute's limitations?

25

police could search and seize the entire contents of the phones, with no apparent restrictions on the type or category of data or information that could be seized, or on how any of that data or information could be used. A warrant supported by such generic "probable cause" to search someone's house and seize the entirety of its contents, with no restrictions on their use, would never fly. See, e.g., *Bryant v. State*, 301 Ga. 617, 619-620 (2) & n.3 (800 SE2d 537) (2017) (warrant that named house and cars to be searched but did not specify items or evidence sought violated particularity requirement); *United States v. Travers*, 233 F3d 1327, 1330 (11th Cir. 2000) (warrant that authorized seizure of all "material reflecting identity" and "anything reflecting potential fraud" violated particularity requirement); *State v. Rothman*, 779 P2d 1, 3, 9, 10-11 (Haw. 1989) (holding that warrant that authorized the seizure of all items in a home that related to the defendant's financials or that tended to show his identity violated particularity requirement and explaining, "If the authorities have only to say 'I have reason to believe that X has committed a crime based on what

26

Y has told me' to get authorization to search X's home for anything and everything X possesses, then no one's papers or possessions are safe"). Yet I suspect that such warrants for cell-phone data remain all too common, even in *Riley*'s wake.

Of course, part of the reason for that is *Riley* itself. *Riley*'s "get a warrant" holding was more or less a mic drop, and the Court has yet to return for an encore.[8] But in the meantime, people haven't stopped using cell phones or committing crimes (would that it were so!). And cell-phone technology keeps advancing, adding both to the value of cell phones for law enforcement seeking to combat crime, and to the privacy consequences the Court worried about.[9] The Court may say more someday about just how the Fourth Amendment applies to and limits warrants for cell-phone data, but until then,

---

[8] To be fair, the Court has since *Riley* addressed related questions about cell-site location information, or CSLI. See *Carpenter*, 138 SCt at 2220 (holding that acquiring CSLI is a search and generally requires a warrant supported by probable cause).

[9] For example, the *Riley* Court pointed out at the time that "[t]he current top-selling smart phone has a standard capacity of 16 gigabytes," which "translates to millions of pages of text, thousands of pictures, or hundreds of videos." Id. at 394. Some popular smart phones today come with up to one terabyte — 1,000 gigabytes — of storage capacity.

our courts must grapple with these questions, in light of *Riley*, ourselves.

Today's decision is a start. The Court holds that a warrant to search and seize "any and all" data stored on a cell phone, not even limited to evidence of the crime at issue, with no specificity about how any of the data could be used, violates the Fourth Amendment's particularity requirement. To be sure, the warrant here has a veneer of particularity to it: the description of the "things to be seized" listed "any and all stored electronic information, including but not limited to" specific kinds of data like images, text messages, videos, and Internet activity. In a way, this description arguably "enabled a prudent officer to locate" the things to be seized "definitely and with reasonable certainty," which is how the particularity requirement typically prevents the fishing expeditions that the Fourth Amendment protects against. See *Fair v. State*, 284 Ga. 165, 170 (3) (a) (664 SE2d 227) (2008) (cleaned up). See also Orin S. Kerr, Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data, 48 Tex. Tech L. Rev. 1, 3 (2015)

28

(citing *Stanford v. Texas*, 379 U.S. 476, 480-486 (85 SCt 506, 13 LE2d 431) (1965) (explaining that the idea behind the Fourth Amendment's particularity requirement was to prevent the general search by "limiting where agents can go and what they can take")). But if an officer could understand what to search for and seize from the phones here, that was only because the sheer breadth of the warrant's description didn't allow for the officer to be wrong: the warrant "specified" that the "things to be seized" included *every bit of data an officer might find on the phone*. Our rejection of that basis for demonstrating particularity is rooted in the unique nature of modern cell phones, including their "immense" capacity to store information of all kinds — analogous to cramming the entirety of one's life into a small slab of plastic, metal, glass, and silicon. When we view cell phones through that lens, the closest analogy I can come up with is a warrant to search a house and seize "any and all atoms of matter stored within, including but not limited to matter in solid, liquid, and gaseous states." I suppose an officer would know what to search for and seize based on that description, too. But both that

29

hypothetical warrant and its digital equivalent here authorize a forbidden general search, and our decision today rightly concludes as much.

But there are plenty more questions where that one came from. Stay with particularity for a moment. Some of this Court's post-*Riley* decisions have concluded that warrants with similarly broad descriptions of the cell-phone data to be searched and seized were sufficiently particular because the warrant as a whole could be read to narrow the scope of the search to evidence of the crimes in question. See *Rickman v. State*, 309 Ga. 38 (842 SE2d 289) (2020); *Westbrook v. State*, 308 Ga. 92 (839 SE2d 620) (2020); *Leili v. State*, 307 Ga. 339 (834 SE2d 847) (2019). But none of these decisions even mentions, much less accounts for, the characteristics of modern cell phones that *Riley* found critical to its Fourth Amendment analysis.[10] As the Presiding Justice notes in his concurrence, it is not clear that warrants that allow police to search every bit of data on a cell phone

---

[10] Only one of these decisions cited *Riley*, and then only because it relied on our decision in *Hawkins*, 290 Ga. 785, which was abrogated by *Riley*. See *Westbrook*, 308 Ga. at 98 (3) (a).

30

necessarily avoid an unconstitutional general search merely by telling police to look only for unspecified evidence of the crime in question. At the least, we ought to be looking at questions like this through the same lens *Riley* did — that is, one that accounts for the uniquely expansive and complex nature of cell-phone data. See, e.g., Kerr at 3 ("The facts of computer storage threaten [the particularity requirement's] limiting role. They create the prospect that computer warrants that are specific on their face will resemble general warrants in execution simply because of the new technological environment.").

Then there's probable cause. I would not be surprised if many warrants to search cell phones are based on a set of facts much like the one here: the police have enough evidence to suspect someone of a crime; they know that person has a cell phone, or they find one in his vicinity or possession; and an officer avers that based on her training and experience, criminals commonly use cell phones to plan or talk about crimes. On its face, it is not crazy to think that a warrant application along these lines could support probable cause.

The probable-cause question is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the magistrate], there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Willis v. State*, 315 Ga. 19, 29-30 (4) (c) (880 SE2d 158) (2022) (punctuation omitted). If the evidence in a given case is good enough to suspect someone of a crime, it may well be true that the person *did* plan or talk about or otherwise put evidence of the crime on his cell phone, and I do not doubt that the experience of many police officers bears that out. And in fact, quite a few courts have upheld probable-cause determinations on similar bases — albeit ones with perhaps a bit more specificity than the warrant application offered in this case. See, e.g., *State v. Goynes*, 927 NW2d 346, 354 (Neb. 2019) (finding probable cause to search cell phone based on officer's training and experience, where officer "explained that cell phone data provides insight for criminal investigations in that cell phones are used for communication, access to information, socialization, research, entertainment, shopping, and other functionality and that these

uses are often found to be tools in criminal activity," that "the data from cell phones can provide information on the motivation, method, and participants involved in a crime," and that "he was aware of numerous instances where cell phones were used by participants in crimes to communicate through voice and text messaging, take photographs of themselves with weapons or illegal narcotics, create videos of their criminal activity, and research crimes in which they participated"); *Moats v. State*, 168 A3d 952, 955, 962-963 (Md. 2017) (collecting other cases where officer's expertise was relied on to establish probable cause that defendant's cell phone would contain evidence of crime and finding probable cause where officer, a 17-year veteran of drug enforcement, stated that he "knows through his training and experience as a Criminal Investigator that individuals who participate in such crimes communicate via cellular telephones, via text messages, call, e-mails etc."); *Stevenson v. State*, 168 A3d 967, 975-977 (Md. 2017) (probable cause to search cell phone of defendant, arrested for robbery-assault, where detective's affidavit explained "that suspects in robberies and assaults will sometimes

33

take pictures, videos and send messages about their criminal activities on their cellular phones"); *United States v. Mathis*, 767 F3d 1264, 1269, 1275-1276 (11th Cir. 2014) (probable cause to search defendant's cell phone about calls years earlier because, "based on [the officer's] knowledge, experience, and training," individuals who sexually abuse children sometimes keep copies of communications with their victims "for many years"); *State v. Henderson*, 854 NW2d 616, 632 (Neb. 2014) (probable cause to search defendant's cell phone where "two men committed the shootings" and defendant was "seen running from the scene," as affiant stated "that in his experience as a detective, he knew that suspects used cell phones to communicate about shootings they have been involved in before, during, and after the shootings").

And yet it is not so easy to square that permissive view of probable cause for cell-phone search warrants with *Riley*. First return to the cell-phones-as-houses analogy: An officer might also reasonably say that in her experience, criminals often store evidence of their crimes — cash, weapons, drug paraphernalia, and more —

34

where they live. Yet "[p]robable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home." *Commonwealth of Pennsylvania v. Kline*, 335 A2d 361, 364 (Pa. Super. 1975). See also *Banks v. State*, 277 Ga. 543, 546-547 (2) (592 SE2d 668) (2004) (evidence implicating defendant in drug dealing was not sufficient to establish probable cause to search his home for drugs); *Shivers v. State*, 258 Ga. App. 253, 255 (573 SE2d 494) (2002) (probable cause to believe defendant was selling crack cocaine did not on its own furnish probable cause to search his home); *Kelleher v. State*, 185 Ga. App. 774, 777 (1) (365 SE2d 889) (1988) (holding that even assuming there was "probable cause for a belief that the appellants were involved in drug trafficking," that information did not establish probable cause to search their residence); *United States v. Jones*, 994 F2d 1051, 1055 (3d Cir. 1993) ("[P]robable cause to arrest does not automatically provide probable cause to search the arrestee's home."). Instead, courts typically require something a little more specific and concrete to provide "a substantial basis for concluding that a search would

35

uncover evidence of wrongdoing" in the suspect's home. *Marlow v. State*, 288 Ga. 769, 771 (2) (707 SE2d 95) (2011) (punctuation omitted) (finding probable cause existed for search of defendant's home for keys to stolen car, where stolen car was in the driveway locked and with alarm activated and the defendant was seen inside the home but refused to answer the door). See also, e.g., *Boldin v. State*, 282 Ga. App. 492, 493-495 (1) - (2) (639 SE2d 522) (2006) (concluding probable cause existed for search of defendant's home for drugs, where officer detected odor of burning marijuana coming from open garage door and, when officer approached to identify himself, defendant grabbed a garbage bag off the floor and ran into house, dropping a zip-lock bag appearing to contain marijuana residue); *Perkins v. State*, 220 Ga. App. 524, 525 (1) (469 SE2d 796) (1996) (finding probable cause for search of defendant's home where confidential informant had conducted controlled buy of marijuana at the home, as well as probable cause to search defendant's second home, based on the results of the search at the first home coupled with information from the informant that defendant was growing

36

marijuana at both homes); *Jones*, 994 F2d at 1056 (finding substantial basis to support probable cause to search arrestee's home for money, clothes, and guns because "cash is the type of loot that criminals seek to hide in secure places like their homes"; two weeks between the crime and the search was "long enough to enable the defendants to hide the cash" and "not so long as to dispel the likelihood that it would still be in their residences"; and "the other items sought, clothing and firearms, are also the types of evidence likely to be kept in a suspect's residence"). Sure, cell phones are not in fact houses, so the analysis might differ in some particulars. But after *Riley*, it is not clear why cell phones would not be treated in similar fashion.

If not — if this generic "criminals use cell phones, too" logic is enough for probable cause to get a warrant to search a suspect's cell phone — it is hard to imagine a case in which police cannot get that warrant. As *Riley* reasoned in declining to apply the search-incident-to-arrest exception to the warrant requirement, "[i]t would be a particularly inexperienced or unimaginative law enforcement officer

who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone." *Riley*, 573 U.S. at 399. But if that's enough for probable cause, it would make *Riley* little more than a paperwork requirement. Maybe, but I am not so sure that *Riley*'s holding is so "hollow." *United States v. Morton*, 46 F4th 331, 340 (5th Cir. 2022) (Higginson, J., concurring in judgment) ("*Riley* requires that officers first get a warrant, but if the fact that the arrestee was carrying a cell phone at the time of arrest is sufficient to support probable cause for a search, then the warrant requirement is merely a paperwork requirement. It cannot be that *Riley*'s holding is so hollow.") (citation omitted). In any event, probable cause too requires careful thought when cell phones are the target.

And what about the "plain view" exception? When an officer executing an otherwise valid search warrant finds in plain view incriminating evidence that is outside the scope of the warrant, this exception says he may still seize the evidence without a warrant and

use it even to investigate and prosecute other crimes.[11] See, e.g., *George v. State*, 312 Ga. 801, 804-805 (865 SE2d 127) (2021) (explaining that a police officer may seize evidence outside the scope of a search warrant if the evidence is in plain view, the officer has not violated the Fourth Amendment in arriving at the place from which he sees the evidence, and the incriminating nature of the evidence is "immediately apparent" (citing *Horton v. California*, 496 U.S. 128 (110 SCt 2301, 110 LE2d 112) (1990))). How does this doctrine translate to a forensic search of a cell phone? The nature of searching electronic data is such that officers executing a carefully particularized warrant may well have to view a vast amount of nonresponsive data to find even information they're properly authorized to seize — especially when the data they're looking for is hidden or obfuscated. See, e.g., Kerr at 16-17. Is all of that nonresponsive data fair game for seizure and later use? Given the massive amounts and endless variations of data that cell phones can

---

[11] In Georgia, a person's "private papers" are carved out from seizure under this exception by statute. See OCGA § 17-5-21 (b).

store, there is no ready analogue in the physical world, and yet significant consequences for law enforcement and privacy hang in the balance.[12]

I could go on, but you get the point: *Riley* made unmistakably clear that when it comes to applying the Fourth Amendment, modern cell phones are not just another physical object. So going forward, all of the courts of our State (including this one) should acknowledge and account for their unique nature when questions like these arise. In doing so, the pace of technological change requires us to "tread carefully" so we do not "embarrass the future." *Carpenter*, 138 SCt at 2220 (quoting *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (64 SCt 950, 88 LE 1283) (1944)). But tread we must.

---

[12] For one prominent Fourth Amendment scholar's view on this issue, see Kerr generally and at 18-27 (proposing that the "plain view" exception still applies to searches of digital information, but later use of nonresponsive data "renders the ongoing seizure [of that data] unreasonable").

With these things in mind, I concur in the majority's opinion. I am authorized to state that Chief Justice Boggs and Justice Warren join in this concurrence.

LaGrua, Justice, concurring in judgment only.

In *Riley v. California,* 573 U.S. 373 (134 SCt 2473, 189 LE2d 430) (2014), the United States Supreme Court provided clear guidance: "Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple — get a warrant." Id. at 403 (IV). Warrants, of course, require probable cause. See id. at 381 (II) (quoting U.S. Const., amend. IV). "To determine whether probable cause exists, the magistrate must review the search-warrant application and make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Willis v. State*, 315 Ga. 19, 29-30 (4) (c) (880 SE2d 158) (2022) (citation and punctuation omitted).

I am quite skeptical that the warrant in this case contained sufficient probable cause because it merely stated that a suspect had been arrested, a cell phone was discovered in his vehicle, and in the law enforcement officer's general "knowledge, training, and experience investigating violent crimes and homicides, [he was] aware that perpetrators commonly use their cell phones to communicate about crimes." This case illustrates a troublesome issue post-*Riley*, which is that many law enforcement officers believe that when a cell phone is discovered during the course of an investigation, probable cause simply exists to search it. I remind the government that the affidavit in support of the search warrant application should establish a link showing that the phone was used to facilitate, commit, or cover up the crime. See *United States v. Mathis*, 767 F3d 1264, 1276 (II) (A) (1) (11th Cir. 2014) ("[A]n affidavit should establish a connection between the defendant and the property to be searched *and* a link between the property and any criminal activity." (abrogated on other grounds by *Lockhart v. United States*, 577 U.S. 347 (136 SCt 958, 194 LE2d 48) (2016)

(citation and punctuation omitted; emphasis supplied)). And, judges are entrusted to uphold the law requiring this link. But, because I agree with the majority opinion's ultimate conclusion affirming the trial court's order granting Wilson's motion to suppress, I concur in judgment only.

Decided February 21, 2023.

Murder, etc. Gwinnett Superior Court. Before Judge Adkins.

*Patsy Austin-Gatson, District Attorney, Christopher M. DeNeve, Kelsey K. Devitto, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellant.

*Clark & Towne, David E. Clark; The Chancey Law Firm, LeAnne C. Hicks*, for appellee.