*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL GEORGIE CARSON,

        Defendant-Appellant.

FOR PUBLICATION
February 15, 2024
9:15 a.m.

No. 355925
Emmet Circuit Court
LC No. 20-005054-FC

Before: HOOD, P.J., and REDFORD and MALDONADO, JJ.

MALDONADO, J.

This case arises from a jury's conclusion that defendant and his romantic partner, Brandie DeGroff, stole nearly $70,000 from their neighbor's safe. Thus, defendant was found guilty of safe breaking, MCL 750.531, larceny of property valued at $20,000 or more, MCL 750.356(2)(a), receiving or concealing stolen property valued at $20,000 or more, MCL 750.535(2)(a), larceny from a building, MCL 750.360, and conspiracy to commit each of those offenses, MCL 750.157a. Defendant was sentenced to serve concurrent terms of 10 to 20 years' imprisonment for the safe-breaking conviction, 9 to 20 years' imprisonment each for the larceny-of-property and receiving-or-concealing convictions, and 3 to 15 years' imprisonment for the larceny-from-a-building conviction, plus terms for each conspiracy conviction matching the sentence for its underlying offense. At defendant's trial, particularly damning was a series of text messages exchanged between defendant and DeGroff in which the couple made numerous references to the crimes for which defendant was convicted. Police obtained these messages following a search of defendant's phone which was executed pursuant to a warrant. However, the warrant was not obtained until after the phone was seized because the phone was seized incident to defendant's arrest. Defendant now raises numerous arguments, most of which framed as ineffective assistance of counsel, regarding the initial seizure of the phone, the warrant supporting the search of its contents, and the actual search of the phone.

As a threshold matter, we hold that it violates the prohibition against multiple punishments for the same offense for a person to be convicted of both larceny and receiving or concealing stolen property when the convictions arise from the same criminal act because a person who steals property necessarily possesses stolen property. Furthermore, it is well established that a search

made pursuant to a general warrant cannot stand; thus, we hold that the warrant authorizing the search of defendant's cell phone violated the particularity requirement because it authorized a general search of the entirety of the phone's contents. Finally, we hold that the fruits of this search cannot be saved by the good faith exception to the exclusionary rule because the warrant was plainly invalid. Accordingly, we reverse each of defendant's convictions and remand for additional proceedings. Because these holdings are sufficient to wholly resolve this appeal and provide guidance on remand, we decline to address other various matters raised by defendant.

## I. BACKGROUND

### A. UNDERLYING FACTS

Defendant and DeGroff were neighbors of Don Billings. Billings, due to his various health problems, was planning to sell off much of his property so that he could eventually move in with his brother. Defendant had experience with selling goods online, so Billings enlisted the assistance of defendant and DeGroff with selling his property in exchange for them receiving 20% of the proceeds. Defendant was given keys to Billings's home and was also granted license to look through and rearrange much of Billings's property. This operation was ongoing from the summer of 2019 until September or October of the same year.

Billings did not trust banks, so he stored his life's savings, along with miscellaneous other documents and valuable goods, in a pair of 40-year-old safes that he kept in his house. The cash was estimated to equal more than $60,000, and it was in hundred-dollar-bills that were divided into $1,000 bundles. The safes could be opened by combination or key, but Billings only used the combination and could not remember where in the house he stored the key. At some point after defendant and DeGroff were no longer assisting Billings, he decided for no particular reason to open the safes. However, he was not able to make the combinations work and ultimately needed to elicit the assistance of a locksmith. Upon opening the safes, Billings discovered that all of the cash was gone. Billings testified that between then and the last time he had opened the safe, only defendant and DeGroff had access to them. However, he never gave them permission to open the safes or attempt to sell any of the safes' contents.

Other circumstantial evidence connected defendant and DeGroff to the theft of the contents of the safes. For example, the police obtained records from a jewelry store indicating that defendant purchased a $1,490 wedding ring on August 6, 2019. The police also obtained a search warrant for records regarding defendant's and DeGroff's joint bank account for each month from October 2018 to November 2019. These records indicated that they had $283.13 in the account at the end of July 2019; that they deposited a total of $9,300 in September 2019; and that their September deposits exceeded every other month during that period by approximately $4,000. However, defendant's employer from April 2, 2019 until August 2, 2019 testified that defendant's net pay during that entire period was approximately $8,400. He further testified that defendant quit because "he ran across some money and some valuables, gold I believe, in a locker that he bought online, or through some kind of a transaction . . . so, [defendant] had a lot of money that [sic] he didn't need to work for a while, or something." Alan Olsen, who lived with and paid rent to defendant and DeGroff from August 2018 until September 2019, testified that the couple was having financial difficulties and that he paid extra rent the final month he lived there to help them.

However, Olsen also testified that in August 2019, the couple began going out "every night," and they would tell him that they were either getting dinner or going to the casino.

Finally, the Slot Director for the Odawa Casino testified that the casino used "players club cards" to track players' earnings because once a certain threshold was exceeded the earnings were subject to income taxation. He explained that the machines at the casino tracked the total money that a player put into the machine, irrespective of wins or losses. In 2019, defendant put a total of $122,000 into the gaming machines at the Odawa Casino, including approximately $57,000 in August of that year. In 2019, defendant's total losses were approximately $5,000, including just shy of $4,000 in losses from August of that year. Meanwhile, Brandy DeGroff put $47,619 into gaming machines at the Odawa Casino in 2019, including $12,919 in August. DeGroff lost $6,021 in 2019, including $2,368 in August.[1]

Defendant was arrested on February 26, 2020. Police arrived at defendant's home at approximately 4:00 a.m., and defendant answered the door wearing only shorts. Prior to escorting him out, Detective Midyett allowed defendant to smoke a cigarette and get dressed. Detective Midyett escorted defendant to his bedroom to get dressed, and while defendant was sitting on his bed tying his shoes, Detective Midyett noticed a cell phone connected to a charger nearby. Detective Midyett asked defendant if the cell phone was his, defendant answered in the affirmative, and the phone was seized. Later, police sought and obtained a warrant to search the phone's contents and discovered text messages exchanged between defendant and DeGroff that proved to be critical to the prosecution's case.

At the trial, the prosecution asked Detective Matt Leirstein to read from a text conversation extracted from defendant's phone, dating from August 5-6, 2019:

> *Q.* [C]an you tell us who's sending this text message?
>
> *A.* This looks like it is from [defendant].
>
> *Q.* Okay. What does it say?
>
> *A.* "Don and Judy were investors in the stock market, complete records for hundreds of thousands of dol1ars."
>
> *Q.* And what is [DeGroff's] response . . . ?

---

[1] At the time of the investigation, this author was employed as the Chief Judge of the Tribal Court for the Little Traverse Bay Bands of Odawa Indians, and as such, this author was the signatory of an order giving full faith and credit to a subpoena issued by the circuit court seeking these casino records. The parties were notified of this connection to their case in writing on August 23, 2023, and the parties were assured that this ministerial act in no way impacted the ability of this panel to fairly decide the issues before it. This Court did not receive any requests for this author's recusal, and any objections from defendant were affirmatively waived at oral arguments.

*A.* "Wow that's crazy.  Have you found any records of what's in the space yet?"

*Q.* And . . . what's [defendant's] response to that?

*A.* [Defendant's] response is, "In the, what, yet?"

*Q.* And what does [DeGroff] say?

*A.* "Lol, laugh out loud, safe," meaning, safe.

*Q.* What is [defendant's] response to that text . . . ?

*A.* "No.  I'm guessing it's all on the computer."

*Q.* How does [DeGroff] respond?

*A.* "I'm turning it on . . . when I get to go up there again."

*Q.* And then what's [defendant's] response?

*A.* "I just did.  . . . Home screen says, 'Welcome Don.' "

*Q.* [DeGroff's] response?

*A.* "Does it ask for security?"

*Q.* What does [defendant] say to that?

*A.* "No.  Opens right up.  There isn't anything on it that I can see.  You look later.  This is more your field."

*Q.* The next text message that [defendant] sends to [DeGroff]—what does that say?

*A.* "We need to go through those pennies.  If there's a 1943 copper penny in there, it's worth millions, these people said.  Also, the 1943s pennies can go for twenty thousand dol1ars each—or, $20,000 each."  It doesn't say dollars.

*Q.* What does [DeGroff] say?

*A.* "Holly Molly! [sic] That's a lot . . . of money."

*Q.* Alright.  [Defendant's] response?

*A.*  "I'm thinking that these guys cashed out stocks, and whatnot, and converted to cash and gold and silver in the safes."

\* \* \*

*Q.* What's this text message [defendant] sends to [DeGroff] at about 4:29 p.m. on August 5 . . . ?

*A.* "These are the keys that you're thinking are safe keys, I think that these are lockbox keys from a bank."

*Q.* And what's [DeGroff's] response?

*A.* "Might be."

The prosecution later asked about an exchange between defendant and DeGroff from August 13, 2019:

*Q.* And what does [defendant] say to [DeGroff]?

*A.* "I'm totally confused. Does he not know there's a million dollars in those safes?"

*Q.* And how does [DeGroff] respond?

*A.* "I really don't think he does. I think he opened it up, . . . threw that money in there and closed it."

The prosecution asked about an exchange between defendant and DeGroff from September 2019:

*Q.* . . . Do you recall the testimony of Mr. Billings that he had confronted the defendant about coins missing from the bedroom of his house?

*A.* Yes, I do.

*Q.* Alright. When are the text messages . . . here, what's the dates ?

*A.* . . . It's gonna be September 15th, 2019 at 4 p.m.

*Q.* . . . The text message I'm highlighting, this is from [defendant] to [DeGroff], is that right?

*A.* Correct.

*Q.* And what does it say?

*A.* "It amazes me that he's worried about a few rolls of coins and never went into the safes."

\* \* \*

*Q.* Go to page 6. This highlighted text from [defendant] to [DeGroff], when was that sent?

-5-

*A.* It looks like, September 15th, 2019 at 10:12 p.m.

*Q.* Okay. And what does [defendant] say to [DeGroff] in this text that I'm highlighting?

*A.* "He must've tried to get into the safe and couldn't and then thought there was a ton of money in that chest."

Finally, the prosecution asked about a pair of exchanges between the couple from October and November 2019:

*Q.* I want you to read for the jury the text message [defendant] sends [DeGroff] on October 29 at about 4:15 p.m. . . . What did [defendant] say to her?

*A.* "Yeah, right. It's all you've done is use me and cheat on me."

*Q.* . . . [DeGroff's] response . . . ?

*A.* "Right. Um, use you for what? 'Cause I haven't made any money or help you steal sixty thousand dollars? And cheat? When? Tell me when I had the opportunity to fucking cheat? You are the one who didn't work most of the summer and hasn't held a single job."

*Q.* . . . Like you to read the text message the defendant sent [DeGroff] on November 24 at 10:51 a.m. . . . What does [defendant] say to Brandy DeGroff in this text message?

*A.* "I just need to go. . . . I'm always full of anger and everyone at home is in line of fire and it's not fair to all of you. It's just best I, not, be there until I get some sort of help to calm me and help me sleep. It doesn't help that I'm overly stressed over our finances. . . . I wish now that I had a way to go rob those entire safes. Tomorrow I'm taking all that other money to the bank and just deposit it . . . . Fuck chasing shit around. I'm trying to sell shit and bring money in but it's not working. I'm a mixed ball of everything and I'm going fucking crazy."

## B. POSTCONVICTION HISTORY

Defendant was found guilty as described in the opening paragraph of this opinion, *supra*, was sentenced in December 2020, and filed a claim of appeal in this Court on January 4, 2021. On September 10, 2021, while this appeal was pending, defendant filed a motion for a new trial in the circuit court. Defendant argued that his cell phone was seized pursuant to an impermissible warrantless search; that the police impermissibly questioned defendant regarding his ownership of the phone without having first issued *Miranda*[2] warnings; that the affidavit in support of the police's request for a search warrant was inadequate in that it failed to establish probable cause to

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed2d 694 (1966).

believe that the cell phone would contain relevant evidence; that the prosecution had impermissibly added charges in retaliation to defendant's motion to suppress; and that defense counsel's failure to raise these issues constituted ineffective assistance of counsel. On October 21, 2021, the circuit court ordered additional briefing, and on December 30, 2021, the trial court ordered a *Ginther*[3] hearing.

The *Ginther* hearing was conducted on April 28, 2022, and defendant's trial attorney, Duane Beach, testified extensively regarding the matters raised in defendant's motion. The relevant details of Beach's testimony are presented in Section II, *infra*, of this opinion. At the hearing's conclusion, the court elected to engage in further deliberations. On May 17, 2022, the circuit court issued a written opinion and order denying defendant's motion for a new trial. In relevant part, the court concluded that (1) Beach erred by failing to seek suppression of defendant's admission to police that he owned the cell phone, but this was harmless because the circumstantial evidence of defendant's ownership was overwhelming; (2) Beach should have filed a motion to suppress the contents of defendant's cell phone "if only to preserve the appeal," but this error was likewise harmless because even if the warrant was deficient, the good faith exception to the exclusionary rule would apply; (3) Beach's decision not to file a motion to quash the amended information was a reasonable strategic choice; (4) defendant's evidentiary arguments were without merit; and (5) defendant's convictions of both larceny of stolen property and receiving and concealing stolen property did not raise double jeopardy concerns.

Following the conclusion of postconviction matters in the circuit court, this appeal proceeded.

## II. DISCUSSION

Defendant argues that finding him guilty of larceny and receiving and concealing stolen property for the same act violated his double jeopardy rights. Defendant further argues that the contents of his cell phone were inadmissible because they were seized pursuant to a facially invalid search warrant and that Beach rendered ineffective assistance by failing to seek exclusion pursuant to these grounds. We agree. Because these conclusions are dispositive, we do not reach defendant's remaining arguments.

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id.* Questions of constitutional law are reviewed de novo. *People v Herron*, 464 Mich 593, 599; 628 NW2d 528 (2001).

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

## A. DOUBLE JEOPARDY

Defendant's double jeopardy rights were violated because his convictions of larceny and receiving or concealing stolen property arose from the same act—the theft of the money taken from Billings's safe.[4]

The Double Jeopardy Clauses of the federal and state Constitutions prohibit placing a criminal defendant twice in jeopardy for a single offense. *People v Booker (After Remand)*, 208 Mich App 163, 172; 527 NW2d 42 (1994), citing US Const, Ams V, XIV and Const 1963, art 1, § 15. "The prohibition against double jeopardy provides three related protections: (1) it protects against a second prosecution for the same offense after acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense." *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004).

The Legislature retains the option, however, of punishing a crime through creating the possibility of multiple convictions and sentences stemming from a single criminal act. See *People v Wafer*, 509 Mich 31, 38; 983 NW2d 315 (2022). Where the Legislature has not clearly indicated its intent to allow cumulative punishments, it is necessary to "examine the *abstract legal elements* of the two offenses, rather than the facts of the case, to determine whether the protection against multiple punishments for the same offense has been violated." *People v Dickinson*, 321 Mich App 1, 15; 909 NW2d 24 (2017) (emphasis added). When applying the "abstract legal elements test," we are instructed to determine whether "each of the offenses for which defendant was convicted has an element that the other does not." *People v Miller*, 498 Mich 13, 19; 869 NW2d 204 (2015) (quotation marks, citation, and alteration omitted). This test can be satisfied and dual convictions may stand even if there is "a substantial overlap in the proof offered to establish the crimes." *Nutt*, 469 Mich at 576, quoting *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932).

This issue was addressed more than 30 years ago when this Court decided *People v Johnson*, 176 Mich App 312; 439 NW2d 345 (1989), a case which defendant views as dispositive. In *Johnson*, the defendant pleaded guilty to larceny of property worth more than $100 and possession of stolen property worth more than $100 following the theft of 14 shirts from a store. *Id*. at 313. To resolve the defendant's double jeopardy argument, this Court inquired "into whether the Legislature intended to authorize multiple punishment under different statutes for a single criminal transaction." *Id*. This Court concluded "that the Legislature did not intend to provide for multiple punishment under both these statutes" because "the punishment provided by each statute is exactly the same" and because "[e]ach statute prohibits conduct which violates the same social

---

[4] While the discussion regarding the contents of defendant's cell phone found in section II.B, *infra*, is sufficient to wholly adjudicate this appeal, the double jeopardy argument still merits addressing because it will be an issue if defendant is tried again on remand. See *People v Richmond*, 486 Mich 29, 34-35; 782 NW2d 187 (2010) (explaining that an issue is not moot if its resolution will have practical effects on the case).

norm: theft of property." *Id*. at 314. This Court concluded that the purpose of the statutory framework was "to enlarge the prosecutor's arsenal to allow alternate charging and conviction of a thief under either the larceny statute or the receiving and concealing statute. Defendant could have been charged and convicted under either statute for this theft, but not under both of them." *Id*. at 315.

The prosecution reminds us that *Johnson* predates the conflict rule, MCR 7.215(J)(1), and thus is not binding precedent. However, although "[d]ecisions published before November 1, 1990, are not binding on this Court . . . , those decisions are entitled to deference under traditional principles of stare decisis and should not be lightly disregarded." *People v Haynes*, 338 Mich App 392, 415 n 1; 980 NW2d 66 (2021). We view *Johnson*'s reasoning as sound, and we reaffirm its conclusion that the legislature did not intend for cumulative punishments pursuant to these two statutes. The true problem with *Johnson* as it applies now is that, because of the state of double jeopardy law at the time it was decided, it did not apply the abstract legal elements test. Thus, as the law currently stands, *Johnson*'s analysis is incomplete. We therefore will finish what *Johnson* started and apply the abstract legal elements test to these two statutes as they are currently written.

We conclude that it is not possible for a person to be guilty of larceny without also being guilty of receiving or concealing stolen property; therefore, the same act cannot give rise to convictions for both crimes. MCL 750.356(1) provides:

A person who commits larceny by stealing any of the following property of another person is guilty of a crime as provided in this section:

(a) Money, goods, or chattels.

(b) A bank note, bank bill, bond, promissory note, due bill, bill of exchange or other bill, draft, order, or certificate.

(c) A book of accounts for or concerning money or goods due, to become due, or to be delivered.

(d) A deed or writing containing a conveyance of land or other valuable contract in force.

(e) A receipt, release, or defeasance.

(f) A writ, process, or public record.

(g) Scrap metal.

On the other hand, MCL 750.535(1) provides: "A person shall not buy, receive, possess, conceal, or aid in the concealment of stolen, embezzled, or converted money, goods, or property knowing, or having reason to know or reason to believe, that the money, goods, or property is stolen, embezzled, or converted."

The catchall term "property" as it is used in MCL 750.535(1) subsumes the entire list provided in MCL 750.356(1)(a)-(g). In other words, if a person steals one of the items articulated

in the list provided in MCL 750.356(1), then the person has necessarily stolen "money, goods, or property" as the term is used in MCL 750.535(1). Additionally, a person who steals necessarily possesses the item that was stolen. Thus, a person who steals one of the items articulated by MCL 750.356(1) has necessarily possessed stolen money, goods, or property. Moreover, MCL 750.356(1)(a) establishes that stealing another's money, goods, or chattels is a crime by itself; Subsections (2) through (5) set forth different penalties depending on the value of the property stolen, covering the whole gamut of possibilities, from under $200 under Subsection (5), to $20,000 or more under Subsection (2). Similarly, MCL 750.535(1) establishes that possessing property actually or constructively known to be stolen is a crime by itself, and the subsections that follow set forth different penalties depending on the value of the property stolen, covering values from under $200 under Subsection (5), to $20,000 or more under Subsection (2)(a). This alignment of statutory provisions thus guarantees that any theft pursuant to MCL 750.356 will constitute possession of stolen property pursuant to MCL 750.535.

For these reasons, we conclude that a person cannot be convicted of both larceny and receiving or concealing stolen property as a result of the same criminal act. However, for the purposes of this case, our analysis does not end here. This was raised through the analytical framework of ineffective assistance, and we still must establish whether defendant has established ineffective assistance of counsel. Little discussion is needed to answer this question in the affirmative. "To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *Head*, 323 Mich App at 539 (quotation marks, citation, and alteration omitted). Defense counsel erred by allowing defendant to be punished twice for the same offense, and the outcome of the proceeding would have been different if not for this error because it would have prevented defendant's conviction of one of these two offenses as well as the accompanying conspiracy charge. Therefore, defendant's double jeopardy argument establishes a claim of ineffective assistance of counsel.

In conclusion, the constitutional double jeopardy protections bar defendant from being reconvicted of both larceny and receiving or concealing stolen property, as well as both corresponding conspiracy charges, if he is tried again on remand.[5]

## B. CONTENTS OF DEFENDANT'S CELL PHONE

The warrant authorizing a search of the contents of defendant's cell phone was too broad in violation of the particularity requirement, and the good faith exception is inapplicable to these

---

[5] In other words, defendant can permissibly be convicted of conspiracy to commit larceny or conspiracy to commit receiving or concealing stolen property but not both. This is because, pursuant to the same analysis, a person cannot conspire to steal property without also conspiring to possess the same stolen property, so a conviction of both would violate the constitutional double jeopardy protections.

facts. Therefore, defense counsel's failure to seek exclusion of the phone's contents for these grounds was ineffective assistance warranting reversal.

## 1. PARTICULARITY REQUIREMENT

The search warrant in this case was invalid because it failed to particularly describe what the police sought to search and seize.

"[T]he general rule is that officers must obtain a warrant for a search to be reasonable under the Fourth Amendment." *People v Hughes*, 506 Mich 512, 525; 958 NW2d 98 (2020). The warrant requirement applies to searches of cell phone data. *Id.*, citing *Riley v California*, 573 US 373; 134 S Ct 2473; 189 L Ed2d 430 (2014). The Fourth Amendment only allows search warrants "particularly describing the place to be searched, and the persons or things to be seized." US Const, Am IV. A substantially similar provision can be found in the Michigan Constitution. Const 1963, art 1 § 11.[6] "The purpose of the particularity requirement in the description of items to be seized is to provide reasonable guidance to the executing officers and to prevent their exercise of undirected discretion in determining what is subject to seizure." *People v Unger*, 278 Mich App 210, 245; 749 NW2d 272 (2008) (quotation marks and citation omitted). "A search warrant is sufficiently particular if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the people and property subject to the warrant." *People v Brcic*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 359497); slip op at 4 (quotation marks and citation omitted). Whether a warrant satisfied the particularity requirement depends on "the circumstances and the types of items involved." *Unger*, 278 Mich App at 245. It is "well settled that a search may not stand on a general warrant." *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004). In the context of cell phone data, the Michigan Supreme Court has concluded that "allowing a search of an entire device for evidence of a crime based upon the possibility that evidence of the crime could be found anywhere on the phone and that the incriminating data could be hidden or manipulated would render the warrant a general warrant . . . ." *Hughes*, 506 Mich at 542, quoting *People v Herrera*, 357 P3d 1227 (Colo 2015).

In this case, the warrant itself described the "person, place, or thing to be searched" as the "[c]ellular device belonging to [defendant] and seized from his person upon arrest."[7] The property to be searched for and seized was described as follows:

---

[6] The Michigan Supreme Court has held that these two provisions are "to be construed to provide the same protection" unless there is a "*compelling reason to impose a different interpretation.*" *People v Katzman*, 505 Mich 1053, 1053; 942 NW2d 36 (2020) (quotation marks and citation omitted).

[7] When assessing whether the warrant sufficiently described the places to be searched and items to be seized, we have *not* considered the contents of the supporting affidavit because the warrant did not contain "appropriate words of incorporation" directing the officers to refer to the affidavit during execution of the search. See *Brcic*, ___ Mich App ___; slip op at 4 (quotation marks and citation omitted).

-11-

Any and all records or documents* pertaining to the investigation of Larceny in a Building and Safe Breaking.  As used above, the term records or documents includes records or documents which were created, modified or stored in electronic or magnetic form and any data, image, or information that is capable of being read or interpreted by a computer.  In order to search for such items, searching agents may seize and search the following: cellular devices; Any [sic] physical keys, encryption devices and similar physical items that are necessary to gain access to the cellular device to be searched or are necessary to gain access to the programs, data, applications and information contained on the cellular device(s) to be searched; Any [sic] passwords, password files, test keys, encryption codes or other computer codes necessary to access the cellular devices, applications and software to be searched or to convert any data, file or information on the cellular device into a readable form; This [sic] shall include thumb print and facial recognition and or digital PIN passwords, electronically stored communications or messages, including any of the items to be found in electronic mail ("e-mail").  Any and all data including text messages, text/picture messages, pictures and videos, address book, any data on the SIM card if applicable, and all records or documents which were created, modified, or stored in electronic or magnetic form and any data, image, or information that is capable of being read or interpreted by a cellular phone or a computer.

Simply put, this was a general warrant that gave the police license to search *everything* on defendant's cell phone in the hopes of finding anything, but nothing in particular, that could help with the investigation.  This warrant did not place any limitations on the permissible scope of the search of defendant's phone.  The only hint of specificity was the opening reference to "the investigation of Larceny in a Building and Safe Breaking," but this small guardrail was negated by the ensuing instruction to search for such items by searching and seizing the entirety of the phone's contents.

The evidence clearly established that there was probable cause to believe that defendant and DeGroff collaborated to break into Billings's safe and steal its contents, which included his entire life's savings.  Given the nature of defendant's and DeGroff's relationship, there was likewise probable cause to believe that defendant had used his phone to communicate with DeGroff regarding these crimes.  Therefore, it would have been wholly appropriate to issue a warrant authorizing the police to engage in a search of the phone's contents limited in scope to correspondence between these two regarding the crimes; this would include SMS messages, internet-based messaging applications such as Messenger or SnapChat, direct messages sent through social media platforms such as Instagram or Twitter, emails, and other similar applications. The warrant that was actually issued placed no limitations on the scope of the search and authorized the police to search everything, specifically mentioning photographs and videos.  Authorization for a search of defendant's photographs and videos, despite there being no evidence suggesting that these files would yield anything relevant, is particularly troubling in light of the tendency of people in our modern world to store compromising photographs and videos of themselves with romantic partners on their mobile devices. Moreover, people usually can directly access file storage systems such as Dropbox and Google Drive directly from their phones, creating a whole new realm of personal information that the police was given free license to peruse.  The pandemic also saw the emergence of applications such as "BetterHelp" and "Talkspace" through

which people can have text message-based sessions with their psychotherapists, and applications such as "MyChart" allow mobile storage of detailed medical records as well as private conversations between patients and doctors. Simply put, this warrant authorized precisely the form "wide-ranging exploratory searches the framers intended to prohibit." *Hughes*, 506 Mich at 539 (quotation marks and citation omitted). Indeed, there are likely many people who would view an unfettered search of the contents of their mobile device as more deeply violative of their privacy than the sort of general search of a home that the framers originally intended to avoid.

We are living in a time during which it can be reasonably assumed that any given person essentially has their entire life accessible from their phones. The Unites States Supreme Court commented on this fact when it decided *Riley*:

> [T]here is an element of pervasiveness that characterizes cell phones but not physical records. Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception. . . . A decade ago police officers searching an arrestee might have occasionally stumbled across a highly personal item such as a diary. But those discoveries were likely to be few and far between. Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate. [*Riley*, 573 US at 395 (citations omitted).]

Thus, warrants for searching and seizing the contents of a modern cell phone must be carefully limited in scope. This is not to say that the police must be told precisely what they are looking for or where to find it, but there must be guardrails in place. The warrant in this case authorized the modern equivalent of the police combing through a person's entire home in search of any evidence that might somehow implicate the person in the crime for which they were a suspect.

We are aware of no binding authority[8] discussing the analysis of whether the language of a warrant authoring a search of cell phone data comports with the particularity requirement; however, several other states have likewise concluded that it is inappropriate for a warrant to authorize an unfettered search of a phone's entire contents. For example, in *State v Smith*, 344 Conn 229, 250-252; 278 A3d 481 (2022), the Connecticut Supreme Court concluded that a warrant "which allowed for a search of the entire contents of the cell phone" was invalid "because it did not sufficiently limit the search of the contents of the cell phone by description of the areas within the cell phone to be searched, or by a time frame reasonably related to the crimes." In *State v Bock*, 310 Or App 329, 335; 485 P3d 931 (2021), the Oregon Court or Appeals concluded that a "warrant that authorizes seizure of any item on a cell phone that might later serve" as evidence of

---

[8] The specifics of the Michigan Supreme Court's opinion in *Hughes* are not entirely on point because the Court was examining whether the police, by examining the phone's entire contents, acted within scope of the warrant. See *Hughes*, 506 Mich at 539-550. In this case, the issue we are discussing is whether the scope of the warrant was too broad, not whether the police acted within the scope of the warrant.

a crime "is tantamount to a general warrant." Additionally, in *People v Coke*, 461 P3d 508, 516 (Colo 2020), Colorado's Supreme Court invalidated a search warrant that allowed police "to search all texts, videos, pictures, contact lists, phone records, and any data that showed ownership or possession." Numerous other examples establish that many states have joined in our conclusion that that the particularity requirement disallows the issuance of warrants authorizing police to search the entirety of a person's cell phone contents for evidence of a particular crime; the massive scale of the personal information people store on their mobile devices means that there must be some limits to the scope of the search. See, e.g., *Richardson v State*, 481 Md 423, 468; 282 A3d 98 (Md Ct App 2022) ("While reasonable minds may differ at times on whether a warrant is sufficiently particular, one thing is clear: given the privacy interests at stake, it is not reasonable for an issuing judge to approve a warrant that simply authorizes police officers to search everything on a cell phone."); *State v Wilson*, 315 Ga 613, 615; 884 SE2d 298 (2023) (invalidating warrant that provided a "limitless authorization to search for and seize any and all data that can be found on [the defendant's] cell phones").

For these reasons, we conclude that the search warrant in this case did not satisfy the particularity requirement.

## 2. GOOD FAITH EXCEPTION

The good faith exception to the exclusionary rule does not apply because this was a facially invalid general warrant upon which no reasonable officer could have relied in objective good faith.

"The exclusionary rule is a judicially created remedy that originated as a means to protect the Fourth Amendment right of citizens to be free from unreasonable searches and seizures." *People v Hawkins*, 468 Mich 488, 498; 668 NW2d 602 (2003). In general, this rule bars admission of evidence that was obtained during an unreasonable search. *Id*. at 498-499. However, the exclusionary rule has been "modified by several exceptions" that allow such evidence to be admitted under certain circumstances. *Id*. (citation omitted). The purpose of the exclusionary rule is not "to 'make whole' a citizen who has been subjected to an unconstitutional search or seizure. Rather," the rule's purpose is to deter future police misconduct. *Id*. at 499. For this reason, the United States Supreme Court carved out the "good-faith" exception to the exclusionary rule when it decided *United States v Leon*, 468 US 897; 104 S Ct 3405; 82 L Ed2d 677 (1984). The good-faith exception "renders evidence seized pursuant to an invalid search warrant admissible as substantive evidence in criminal proceedings where the police acted in reasonable reliance on a presumptively valid search warrant that was later declared invalid." *People v Hughes*, 339 Mich App 99, 111; 981 NW2d 182 (2021). This exception has also been recognized by the Michigan Supreme Court. *People v Goldston*, 470 Mich 523, 525-526; 682 NW2d 479 (2004). The rationale behind this exception is that the exclusionary rule was crafted to deter police misconduct and therefore should not apply when a *magistrate* made an error rather than the police. *Hughes*, 339 Mich App at 111.

The good-faith exception does not mean that evidence obtained pursuant to a search warrant will always be admitted, and the United States Supreme Court explained scenarios in which this exception will not apply when it decided *Leon*:

Suppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role . . . ; in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in *failing to particularize the place to be searched or the things to be seized*—that the executing officers cannot reasonably presume it to be valid. [*Leon*, 468 US at 923 (citations omitted; emphasis added).]

There is little guidance offered by Michigan caselaw on the applicability of the good-faith exception in the context of a search warrant violative of the particularity requirement. This Court has suggested that a search warrant is "plainly invalid" if "it failed to describe the type of evidence to be sought." *Brcic*, ___ Mich App at ___; slip op at 4, quoting *Groh v Ramirez*, 540 US 551, 557; 124 S Ct 1284; 157 L Ed2d 1068 (2004). However, this statement was not made in the context of a good-faith exception analysis. There is some guidance from other jurisdictions, but the results are mixed. For example, in *Richardson*, 481 Md at 470-472, the Maryland Court of appeals concluded that the good-faith exception did apply, reasoning that the officers who executed the warrant could not have known that it was impermissible to search the entire phone. However, in *Burns v United States*, 235 A 3d 758 (DC Ct App 2020), the District of Columbia Court of Appeals concluded that the good-faith exception did not apply because of the obvious overbreadth of the warrant. One difficulty that arises when looking to other states for guidance is that there is significant variance in the extent to which each state has adopted this exception to the exclusionary rule. For example, in *State v McLawhorn*, 636 SW3d 210, 245 (Tenn Ct Crim App 2020), the Tennessee Criminal Court of Appeals concluded that the good-faith exception did not apply in a case in which a warrant impermissibly authorized "an unfettered search of all data on the Defendant's cell phone," but Tennessee had only adopted a limited version of the good-faith exception that applied to "evidence which had been seized in accord with binding precedent existing at the time," cases involving technical flaws to otherwise valid warrants, and cases involving negligence as opposed to "systemic error or reckless disregard of constitutional requirement." *Id.* (quotation marks and citation omitted). In Michigan, while there is no caselaw suggesting that our good-faith exception is coextensive with its federal counterpart, there likewise appears to be no caselaw restricting its applicability in manners not present in federal caselaw.

We conclude that the warrant in this specific case was so facially deficient by virtue of its failure to particularize the places to be searched and things to be seized that the executing officers could not have reasonably presumed it to be valid. See *Leon*, 468 US at 923. As discussed in detail in section II.A, *supra*, this case involved a general warrant authorizing a search of the phone's entire contents for any incriminating evidence. It is common knowledge that people store an incredible amount of personal data on their phones, and the prohibition against general warrants is long-established. The plainly invalid breadth of this warrant is further evidenced by the fact that the police ultimately seized approximately *1,000 pages of personal information* from defendant's phone that consisted of all of its contents. No officer could reasonably have believed that such a

-15-

far-reaching search complied with the constitutional demand for particularity. Lack of good-faith is further evidenced by the affidavit submitted by the police when they sought the search warrant because the police made no secret of their intent to engage in a fishing expedition. In particular, the following paragraph is alarming:

> Records created by mobile communication devices can also assist law enforcement in establishing communication activity/behavior, patterns, anomalies, patterns of life and often the identity of the device user. This is most effectively accomplished by reviewing a larger segment of records ranging prior to and after the incident under investigation if possible.

The preparing officer essentially admitted knowledge of the breadth of personal information available on modern cell phones, as was detailed above,[9] and stated his intent to comb through all of it.

To be clear, we do *not* hold that searches executed pursuant to a warrant that is defective by virtue of allowing an overly broad search of a person's cell phone can *never* be saved by the good-faith exception. However, given the particularly egregious facts of this case, we conclude that the good faith exception does not apply, and the contents of defendant's cell phone should not have been admitted at his trial.

## 3. INEFFECTIVE ASSISTANCE

Reversal of defendant's conviction is warranted because defense counsel's failure to seek exclusion of the cell phone's contents on this basis constituted defective representation, and there is a reasonable probability that the outcome of defendant's trial would have been different but for defense counsel's error.

The Sixth Amendment of the United States Constitution guarantees that criminal defendants receive effective assistance of counsel. *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed2d 674 (1984). Michigan's Constitution affords this right the same level of protection as the United States Constitution. *People v Pickens*, 446 Mich 298, 318-320; 521 NW2d 797 (1994). Accordingly, "[t]o prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *Head*, 323 Mich App at 539 (quotation marks, citation, and alteration omitted). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). This Court presumes counsel was effective, and defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539.

As discussed above, the contents of defendant's cell phone were inadmissible because the warrant's total failure to comply with the particularity requirement rendered it facially invalid. Despite this, defense counsel did not move for the exclusion of the cell phone records on this basis.

---

[9] See section II.A, *supra*.

Such matters are presumed to be an exercise of reasonable trial strategy by defense counsel, *People v Traver*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019), but after reviewing the record, we conclude that the presumption has been overcome. Defense counsel did not have a valid strategic reason for failing to seek exclusion of the cell phone's contents as violative of the particularity requirement.

Attorney Beach testified about this issue at the *Ginther* hearing. Beach described portions of the warrant's supporting affidavit as "weasel language" and acknowledged that the warrant authorized seizure of all of the phone's contents, but he did not believe suppression on this basis would have been warranted because it "got really specific towards the end." Beach explained why he did not file a motion to suppress the contents of the cell phone in addition to his motion to suppress the phone itself:

> Well, because the Affidavit was fine. I—I thought in my mind that [the trial judge erred by not granting the motion to suppress the cell phone] . . . . [A]nd then I look at this search warrant, and frankly, this search warrant probably provides a basis to look for that cell phone. And after that, the content of the cell phone is basically pro forma. I'm surprised it said as much as it did. If they got the cell phone, they're going to look at it.

Beach appeared to be suggesting a mistaken belief that once the police had a lawful basis for seizing the phone they also had the right to search the entirety of its contents. Therefore, once he failed to convince the court that the warrantless seizure of the device itself was unlawful, he did not seem to believe he had any recourse. In other words, Beach's failure to seek exclusion of the phone's contents was based on a misunderstanding of the law rather than trial strategy.

Turning to the second prong, it is not difficult for us to conclude that there is a reasonable probability that the trial would have had a different outcome had the contents of the cell phone not been admitted.[10] We acknowledge that there was persuasive circumstantial evidence outside of the phone's contents connecting defendant to the crimes. The properly admitted evidence established that defendant did not have a significant source of income when he began selling property for Billings and that he and DeGroff only had $283.13 in their joint bank account at the end of July 2019. However, in September 2019, not long before Billings discovered that the contents of the safes were missing, defendant deposited nearly $10,000 into the bank account he shared with DeGroff, and in August 2019 defendant put $57,000 into the gaming machines at the Odawa Casino. Also, defendant quit his job and told his boss that he no longer needed the work because he had found valuables in a locker he purchased online. Moreover, Billings testified that only defendant and DeGroff could have accessed the safes during the period when they were

---

[10] Indeed, even the trial court, following the *Ginther* hearing, described "[t]he contents of the phone—specifically the text messages" as "integral to the Prosecutor's case" and opined that there was "a reasonable probability that the outcome of the trial would have been different" if the phone's contents had been excluded. The reason the court did not grant a new trial, however, was due to its erroneous conclusion that the good-faith exception applied.

emptied. This evidence was sufficient to prove beyond a reasonable doubt that defendant and DeGroff conspired to steal the contents of Billings's safe.[11]

While the properly admitted evidence was persuasive, the tainted evidence was essentially definitive. Indeed, defendant and DeGroff each made several statements that could fairly be characterized as confessions. For example, on August 5, defendant sent DeGroff a text telling her that he believed he had found keys to the safes. On August 13, defendant told DeGroff that there was "a million dollars in those safes," and DeGroff speculated that Billings just "threw that money in [the safe] and closed it." On October 29, DeGroff insinuated that she helped defendant "steal sixty thousand dollars." On November 24, defendant wished he "had a way to go rob those entire safes." The value of these text messages to the prosecution's case-in-chief, other persuasive evidence notwithstanding, cannot be overstated.

Had the jury been presented only the properly admitted evidence, a guilty verdict would have been unsurprising. When this evidence is taken in conjunction with the text messages, a not guilty verdict would have been shocking. Therefore, we conclude that there is a reasonable probability that the outcome of the proceeding would have been different if not for Beach's mistakes.

### III. CONCLUSION

Defendant's convictions are reversed. We remand for additional proceedings consistent with this opinion. If defendant is retried, evidence regarding the contents of defendant's cell phone shall not be admitted. Additionally, defendant shall not be reconvicted of both larceny of property valued at $20,000 or more and receiving and concealing stolen property valued at $20,000 or more. Nor shall defendant be convicted of the corresponding conspiracy counts for both of those charges. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Noah P. Hood

---

[11] Indeed, given the strength of the properly admitted evidence, it is not obvious that the outcome of this appeal would be the same if we were reviewing through a different reversal standard, such as plain error or harmless error, rather than the *Strickland* "reasonable probability" test.