**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 3, 2025**

# In the Court of Appeals of Georgia

A25A1122. TALLINGTON v. THE STATE.

HODGES, Judge.

Following a jury trial, the Superior Court of Fulton County entered a judgment of conviction against Christopher Tallington for one count each of trafficking a person for labor or sexual servitude (OCGA § 16-5-46), pimping (OCGA § 16-6-11), pandering (OCGA § 16-6-12), statutory rape (OCGA § 16-6-3), child molestation (OCGA § 16-6-4), sexual exploitation of children (OCGA § 16-12-100), and simple battery (OCGA § 16-5-23).[1] Tallington appeals from the trial court's denial of his motion for new trial as amended, arguing that the evidence was insufficient to support

---

[1] The jury acquitted Tallington of one count of obstruction of a law enforcement officer.

his convictions and that he received ineffective assistance of trial counsel. Finding no error, we affirm.

Viewed in a light most favorable to the jury's verdict,[2] the evidence adduced at trial revealed that the then-14-year-old victim, K. R., ran away from her mother's home in Jonesboro, Clayton County, in late November 2015. She made her way to the Old National Highway area of College Park and, within a couple of hours of arriving, first met Tallington at an area Burger King restaurant.[3] Tallington was "nice" to K. R. and, with nowhere to go, K. R. went with Tallington and his cousin, Amber Murrah, to a Super 8 Motel on Old National Highway. K. R. and Tallington talked and, within "a couple of days" after the two met, they became "more than just friends[,]" as K. R. viewed Tallington as her boyfriend. Eventually, the two began having oral and vaginal sexual intercourse. K. R. also witnessed Murrah "[s]elling her body."

As their relationship progressed, K. R. wanted to earn money, and she decided that advertising on backpage.com for sexual services was a safer alternative than

---

[2] See, e.g., *Prescott v. State*, 357 Ga. App. 375 (850 SE2d 812) (2020).

[3] During opening statements, the prosecuting attorney claimed that Tallington was 26 years old at the time.

"walking the streets." Tallington initially posted advertisements for K. R. on backpage.com until she started posting them herself. Tallington's phone number was listed as the point of contact in the advertisements. Tallington also took nude photographs of K. R., photographs of her genital area, and videos of her as she showered. In addition, Tallington monitored the time K. R. spent with clients, which K. R. referred to as "plays," as Tallington would stand outside the hotel room and knock on the door when the client's time expired. K. R. gave any money she earned from her sexual services to Tallington, who would then buy things for her, and K. R. believed that Tallington's sole income was derived from her exchanging sex with clients for money.

On January 12, 2016, a College Park police officer encountered a man and a girl standing in front of a Dollar General store on Old National Highway in College Park, Fulton County. The girl appeared very thin and did not appear to be an adult. When officers initially questioned the pair concerning their reasons for standing in front of the store, the man became argumentative and declined to provide his name, while the girl became combative. Officers were ultimately able to identify the man as Tallington and determined that the girl, K. R., was a runaway juvenile from Clayton County.

Tallington stated that he and K. R. were waiting for his cousin, Murrah, to exit the store. Officers informed Tallington he was free to leave, but he "waited around and said he was waiting on [K. R.]." At that point, officers told Tallington that K. R. was underage and would be accompanying them since she was a runaway juvenile, and they transported her to the College Park police station. Officers contacted several of K. R.'s family members, but when none agreed to pick up K. R. from the station, officers transported her to her home in Riverdale, Clayton County, and released her to her mother's custody. At some point thereafter, K. R. ran away again.

On January 26, 2016, a security guard for a College Park-area club and restaurant spotted a man and a girl arguing, as the man grabbed the girl by the arm and the neck. The girl repeatedly yelled, "Stop. Leave me alone. I don't want to go." The pair appeared to be walking from the vicinity of a Baymont Hotel toward a gas station next door to the club. As the pair got closer, the security guard could see that the girl "looked like a kid[,]" which prompted him to telephone 911. Officers responded to the call and again encountered K. R. and Tallington at the gas station on Old National Highway in College Park.[4] Tallington ultimately admitted that they had stayed at the

---

[4] One of the responding officers had also encountered K. R. and Tallington at the Dollar General store two weeks prior.

Baymont Hotel with his cousin[5] and that he grabbed K. R., at which time he was handcuffed. Officers also detained K. R., during which she volunteered that Tallington secured a hotel room at the Baymont Hotel "so she could have sex for money." She also claimed that she was sexually active with Tallington and showed an officer a photograph of her kissing Tallington and a video of Tallington blowing smoke in her face as she slept. K. R. was subsequently transported to an Atlanta-area youth detention center.

During the course of their investigation, officers recovered two cell phones from K. R. An investigator obtained a search warrant for each phone to extract data from the phones. The phones, which contained Tallington's e-mail and user accounts, contained multiple nude photographs of K. R., as well as photographs of Tallington himself and more than a dozen photographs of K. R. and Tallington together. Officers also determined that the cell phones were connected to several advertisements for sexual encounters with K. R. on backpage.com between December 13, 2015 and January 26, 2016. One such advertisement for K. R., who went by "Coco" and

---

[5] The Baymont Hotel front desk manager testified that Tallington's cousin, Murrah, rented Room 329 at the Baymont from January 21 to January 27, 2016. The manager added that she asked Murrah to leave the hotel on January 26 because of the "traffic" of "[m]ultiple people in and out of the room."

"Slim," had been placed on January 26, 2016 — the day K. R. was rescued. The extraction report also indicated that the phones were frequently located at a Baymont Hotel and Super 8 Motel in College Park.

K. R.'s medical evaluation did not reveal any evidence of acute injuries in her genital area, although the examining nurse did note an odor and vaginal discharge that were indicative of a sexually-transmitted disease.[6] Upon review of K. R.'s forensic interview, in which K. R. was closed, defensive, self-protecting, and professed to have a connection with Tallington, an expert witness opined that K. R.'s behavior was consistent with victims of commercial sexual exploitation.[7]

A Fulton County grand jury indicted Tallington for one count each of trafficking a person for labor or sexual servitude, pimping, pandering, statutory rape, child molestation, sexual exploitation of a minor, simple battery, and obstruction of an officer. A Fulton County jury found Tallington guilty of each count except

---

[6] In fact, the nurse prescribed medications for K. R. to treat three different sexually-transmitted diseases.

[7] The State also presented testimony that Tallington had been arrested for pimping during an undercover operation in September 2011.

obstruction of an officer, and the trial court denied Tallington's motion for new trial as amended. This appeal followed.

1. Tallington first contends that the evidence was insufficient to support his conviction for statutory rape specifically and the remainder of his convictions generally. We are not persuaded.

> On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys the presumption of innocence; moreover, an appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citation and punctuation omitted.) *Prescott*, 357 Ga. App. at 381 (2).

(a) *Statutory Rape.* "A person commits the offense of statutory rape when he . . . engages in sexual intercourse with any person under the age of 16 years and not his . . . spouse, provided that no conviction shall be had for this offense on the unsupported testimony of the victim." OCGA § 16-6-3 (a).

> The quantum of corroboration needed in a statutory rape case is not that which is in itself sufficient to convict the accused, but only that amount of independent evidence which tends to prove that the incident occurred as alleged. Slight circumstances may be sufficient corroboration, and ultimately the question of corroboration is one for the jury.

(Citation and punctuation omitted.) *Brown v. State*, 362 Ga. App. 377, 380 (1) (868 SE2d 493) (2022); see also *Nguyen v. State*, 351 Ga. App. 509, 511 (1) (b) (831 SE2d 213) (2019). Among other evidence, "a victim's prior consistent statements, in the form of her outcry to others as testified to by them, may constitute sufficient corroboration in a case of statutory rape." (Citation and punctuation omitted.) *Garner v. State*, 346 Ga. App. 351, 356 (1) (816 SE2d 368) (2018).

In this case, then-14-year-old K. R. testified that, as her relationship with Tallington quickly advanced, she and Tallington engaged in sexual intercourse on multiple occasions. Moreover, an officer who responded to the security guard's 911 call on January 26, 2016 testified that K. R. told officers she was sexually active with Tallington. Taken together, K. R.'s direct testimony, coupled with her outcry to officers on January 26, 2016, supplied sufficient evidence and corroboration to allow

the jury to find Tallington guilty of statutory rape beyond a reasonable doubt. See, e.g., *Brown*, 362 Ga. App. at 380 (1); *Garner*, 346 Ga. App. at 356 (1).

(b) *Remaining Charges*. Cursorily, Tallington "requests the verdicts as to the remaining counts be reversed" because those convictions "rise and fall largely on K. R.'s credibility." As a threshold matter, "mere conclusory statements are not the type of meaningful argument contemplated by our rules." (Citation and punctuation omitted.) *Bowman v. State*, 358 Ga. App. 612, 615 (2) (856 SE2d 11) (2021). Even so, "resolving evidentiary conflicts and inconsistencies, and assessing witness credibility, are the province of the factfinder, not this Court." (Citation and punctuation omitted.) *Garner*, 346 Ga. App. at 355 (1); see also *Prescott*, 357 Ga. App. at 381 (2). Accordingly, Tallington's brief statement provides no basis for reversal.

2. Next, Tallington argues that he received ineffective assistance of trial counsel due to counsel's failure to move to suppress evidence taken from a white LG cell phone in K. R.'s possession that Tallington now claims belonged to him. In particular, Tallington asserts that K. R. did not have authority to possess or access the phone and that the State's subsequent search warrant was overly broad. We disagree.

To demonstrate ineffective assistance of trial counsel, an appellant

must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case. In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo.

(Citation and punctuation omitted.) *Roberts v. State*, 322 Ga. App. 659, 663 (3) (745 SE2d 850) (2013).

If an appellant fails to meet his burden of proving either prong of the *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984) test, the reviewing court need not examine the other prong. This burden — though not impossible to carry — is a heavy one.

(Citations and punctuation omitted.) *Ramirez v. State*, 374 Ga. App. 646, 654 (2) (913 SE2d 768) (2025).

Importantly, "the failure to file a motion to suppress does not automatically constitute ineffective assistance of counsel." (Citation and punctuation omitted.) *Johnson v. State*, 367 Ga. App. 344, 349 (2) (a) (886 SE2d 5) (2023). Rather,

> [w]hen [an] ineffective assistance of counsel claim is based on failure to file a motion [to suppress], the defendant must make a *strong showing* that the evidence would have been suppressed had a motion to suppress been filed. Indeed, counsel's failure to make a motion which will not succeed cannot provide a basis for finding ineffective assistance of counsel.

(Citations and punctuation omitted; emphasis supplied.) *Dent v. State*, 303 Ga. 110, 118 (4) (a) (810 SE2d 527) (2018); see also *Johnson*, 367 Ga. App. at 349 (2) (a); *Ferguson v. State*, 354 Ga. App. 867, 868 (2) (842 SE2d 77) (2020) (noting that if a defendant fails to make a strong showing that evidence would have been suppressed, "he has failed to establish deficient performance by his trial counsel") (citation and punctuation omitted).

(a) *Ownership of the Phone*. Here, Tallington has not made a "strong showing" that a motion to suppress would have been successful. *Dent*, 303 Ga. at 118 (4) (a). In essence, Tallington contends that officers should not have relied upon "K. R.'s unauthorized accessing of [his] cell phone" in obtaining the search warrant for the LG phone. Properly considered, Tallington's argument posits that officers lacked probable cause to search the LG phone based upon K. R.'s statements that she owned the phone. This argument lacks merit.

Georgia law provides that

a search warrant will only issue upon facts "sufficient to show probable cause that a crime is being committed or has been committed." OCGA § 17-5-21 (a). The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

(Citation and punctuation omitted.) *State v. Santiago*, 371 Ga. App. 720, 722 (a) (902 SE2d 715) (2024). Of note,

[t]he test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent people act. Moreover, *even doubtful cases should be resolved in favor of upholding a warrant.*

(Citation and punctuation omitted; emphasis supplied.) Id. at 723 (a). "The duty of an appellate court reviewing a search warrant is to determine, based on the totality of the circumstances, whether the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant[,]" and "[a] magistrate's decision

12

to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court." (Citations and punctuation omitted.) Id. at 722 (a).

In this case, the evidence concerning the rightful ownership of the LG phone when it was seized was conflicting. In fact, it is not even clear whether Tallington would have had standing to challenge the seizure of the phone, based upon K. R.'s initial statements to officers that she owned the phone, which were later used to secure a search warrant to extract data from the phone. For example, the evidence demonstrated that officers initially obtained two phones, including the LG phone, from K. R.'s person — not Tallington. K. R. claimed that both phones were hers, and Tallington even denied that either of the phones were his. K. R. gave officers access to the LG phone and allowed them to look through the phone while she was at the police station on January 26, 2016. K. R. also provided officers the number associated with the LG phone, which officers then used to obtain information from backpage.com.

At trial, however, K. R. initially testified that the LG phone was "[Tallington's] phone" and that it belonged to him. K. R. also denied telling officers that the LG phone was hers and claimed that the phone was taken from Tallington. However, she

also admitted that she sometimes used the phone, that she and Tallington used the phone "interchangeably," and that she used the phone to post her backpage.com advertisements. Ultimately, K. R. acknowledged that she had control over the LG phone and used it.

Based upon law enforcement's initial interaction with K. R., an investigator obtained a search warrant for the LG phone to extract data from it. The phone contained Tallington's e-mail and user accounts as well as nude photographs of K. R., photographs of Tallington himself, and several photographs of K. R. and Tallington together. Officers also determined that the phone was connected to several advertisements on backpage.com for K. R.'s sexual services. Photographs of K. R. from the backpage.com advertisements were also found on the phone.

Accordingly, the totality of the circumstances — including K. R.'s possession of the LG phone, access of the phone, and permission for officers to initially inspect the phone, tied to Tallington's denial that he owned the phone — would have given a magistrate sufficient probable cause to issue a search warrant to extract data from the phone. Moreover, to the extent the question of probable cause could be considered close, we have repeatedly held that "doubtful cases should be resolved in favor of

upholding a warrant." (Citation and punctuation omitted.) *Santiago*, 371 Ga. App. at 723 (a). Under these circumstances, we conclude that Tallington "has failed to make the required strong showing that the damaging evidence would have been suppressed." (Citation and punctuation omitted.) *Smerk v. State*, 374 Ga. App. 590, 596 (1) (a) (913 SE2d 712) (2025); see also *Crayton v. State*, 298 Ga. 792, 797-798 (3) (b) (784 SE2d 343) (2016).

(b) *Search Warrant.* Tallington next contends that the search warrant for the LG phone was unlawfully overbroad. This argument fails.

The Fourth Amendment to the United States Constitution requires that a search warrant particularly describe the article or articles sought. In addition to requiring that officers have enough guidance to locate and seize only those items the warrant authorizes them to seize, this particularity requirement also prevents general searches — that general, exploratory rummaging in a person's belongings by the government that has been rejected since the founding as a violation of fundamental rights. The particularity requirement is applied with a practical margin of flexibility, depending on the type of property to be seized, and a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit. The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional.

(Citation and punctuation omitted.) *Santiago*, 371 Ga. App. at 725-726 (c). See also *Rickman v. State*, 309 Ga. 38, 42 (2) (842 SE2d 289) (2020).

Here, the investigator who completed the search warrant affidavit and application averred that "[b]ased on . . . [K. R.]'s account of using the cellphone to communicate with potential clients and having at least one video of a sexual encounter on her phone, [the investigator] would like to conduct a forensic extraction of all communications on the cell phone, including but not limited to text messages, videos and telephone calls." The search warrant authorized officers to seize the phone, which was taken as "evidence in the crime of HUMAN TRAFFICKING," and to conduct a data extraction. "Here, the warrant[], read as a whole, limited the search of the contents of [the LG] cell phone[] to items reasonably appearing to be connected to [Tallington's crimes]." *Rickman*, 309 Ga. at 42 (2). Moreover, even assuming that the warrant was overbroad, "where a search as it was actually conducted is lawful, it is not rendered invalid merely because the warrant pursuant to which it was made was overbroad." (Citation and punctuation omitted.) *Santiago*, 371 Ga. App. at 726 (c).

In short, Tallington has failed to make a strong showing that a motion to suppress evidence taken from the LG phone would have been successful. As counsel's

failure to make a motion that would not succeed cannot provide a basis for finding ineffective assistance of counsel, see *Ramirez*, 374 Ga. App. at 657 (2) (a), it follows that Tallington's enumeration fails.

*Judgment affirmed. McFadden, P. J., and Pipkin, J., concur.*